Filed 7/2/19

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>LIONEL BRACKINS,<br><br>　　　Defendant and Appellant. | H043584<br>(Santa Clara County<br>　Super. Ct. No. C1497153) |


Defendant Lionel Brackins was convicted by jury trial of aggravated assault (Pen. Code § 245, subd. (a)(4)),[1] inflicting corporal injury on a former cohabitant (§ 273.5, subd. (a)), attempting to dissuade a witness (§ 136.1, subd. (b)(1)), and misdemeanor vandalism (§ 594, subds. (a), (b)(2)(A)).[2] The court sentenced defendant to four years in prison.[3]

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

[2] Although the court found true allegations that defendant had suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) that was also a prior serious felony conviction (§ 667, subd. (a)) and had served prison terms for two prior felony convictions (§ 667.5, subd. (b)), the prosecutor subsequently conceded that the prior conviction was neither a strike nor a serious felony, and the court struck the punishment for the prison priors.

[3] The court imposed a four-year upper term for the aggravated assault count. It imposed an upper term for the other counts also, but it stayed the corporal injury count under section 654 and imposed a concurrent term for the dissuading count.

On appeal, defendant contends that the trial court prejudicially erred in (1) denying his request to modify CALCRIM No. 2622, the attempted dissuading instruction, to insert language requiring a finding of malice and describing when a presumption that malice was absent would apply, and (2) instructing the jury with CALCRIM No. 850 about expert testimony by a prosecution expert on intimate partner violence. We find that the trial court properly denied the request for modifications to CALCRIM No. 2622 because a violation of section 136.1, subdivision (b), unlike a violation of section 136.1, subdivision (a), does not require malice. We also reject defendant's challenge to CALCRIM No. 850. Accordingly, we affirm the judgment.

## I. Prosecution's Case At Trial

Janet Amezcua and defendant had been in a relationship for 10 years and had four children, including Jane Doe. Although Amezcua testified at trial that their "arguments" had never become "physical," the prosecution produced evidence at trial that defendant had repeatedly physically assaulted Amezcua. The charged offenses occurred in August 2014 and January 2015, but evidence of several prior events was also introduced at trial. At trial, Amezcua denied that any domestic violence had occurred, and she claimed that she called the police on numerous occasions only because she was "mad and angry" at defendant.

When the police were summoned to Amezcua's residence in February 2008, Amezcua had a bruise on her arm and swelling on her face. She told the officer that defendant had caused the injury to her arm, though she denied that he had caused the injury to her face. In October 2011, the police arrived at Amezcua's apartment and found her "bleeding pretty heavily" from her right hand and visibly shaking. Amezcua told the officer that she had asked defendant to leave, and he had responded by getting "angry," grabbing her, throwing her down on the couch repeatedly, and then punching her in the arm. "He then got up and went to the kitchen and got a knife and approached her with

2

the knife at which point she thought she was going to be stabbed by him with the knife and she grabbed the knife out of his hand," thereby cutting her hand. At trial, Amezcua admitted that she had told the police that defendant had threatened her with a knife, but she denied that he was responsible for her grabbing the knife and cutting herself. In April 2012, the police arrived at Amezcua's residence and found her with a swollen, lacerated, bloody lip and a loose tooth. She told the officer that defendant had "punched her in the mouth" after she "tried to strike" him. When she tried to leave, he blocked her way and "pushed her down on the couch."

The charged corporal injury and aggravated assault counts arose from events in August 2014. The police arrived at Amezcua's residence in response to a domestic violence call. Amezcua, who was crying, told the responding officer that she and defendant had argued after she refused to let him use her cell phone. He pushed her onto the couch, got on top of her, and grabbed her throat with his hand. Defendant choked her for a minute. She could not breathe, and she lost consciousness for a few seconds. When she regained consciousness, he told her not to say anything. She pushed him off her and tried to run away, and after a struggle with defendant, she escaped his grasp, left the residence, and called 911. She asked the officer to obtain a protective order for her, and he did so. Amezcua's neck was red and had a small abrasion, and she reported pain in her neck.

Amezcua told the officer that Jane Doe had been present during the incident. Jane told the police that Amezcua and defendant had been "fighting" before the police arrived. She saw defendant push Amezcua down on the couch and begin "twisting her ankle." Then defendant "choked" Amezcua with one hand on her throat. Jane reported that Amezcua "was making like a choking, gagging type of sound and it made her very sad to see that." After a minute, defendant stopped choking Amezcua and "started twisting her ankle again." When Amezcua managed to get up and tried to leave the residence,

3

defendant "grabbed [Amezcua] by the hair and yanked her back into the apartment." Eventually, Amezcua escaped from the apartment and called the police.

At trial, Jane was a reluctant witness and claimed to have no memory of most of the events or of talking to the police about them. Amezcua's trial testimony minimized the violence. She admitted that she and defendant had argued about defendant's desire to use her phone and that he had tried to take her phone from her hand. He did not succeed, and he began yelling at her. She told him to leave and called the police when he did not. Amezcua testified at trial both that she did not remember what she had told the police and that she had lied to the police about defendant choking her. She testified that she lied because she was "desperate," "frustrated," and "angry," and she "wanted him to leave." Amezcua claimed that the scratch on her neck was self-inflicted.

In January 2015, the police were dispatched to Amezcua's apartment after a report of a domestic disturbance. The officer made contact with Amezcua, who reported that defendant had kicked the door and broken it. The officer observed that the door frame was cracked, the locking plate was on the ground, and the door would not close. There was a footprint on the door. Jane was present while the officer was talking to Amezcua. Amezcua told the officer that defendant had been "yelling and screaming" at Jane, causing Jane to cry. Amezcua had told defendant to leave, but he did not. She left the apartment to call 911, and "he chased her." She ran back into her apartment and closed and locked the door. That was when defendant kicked in and broke the door. Defendant fled before the officer arrived.

While the officer was talking to Amezcua, "the cell phone rang and rang and Jane Doe held it up and said, He's calling! He's calling!" The officer looked at the phone and saw from the "caller ID" that defendant was calling. Jane asked the officer if she should answer it, and the officer said "Okay." Jane answered the phone and put it on speaker phone. Jane "said hello," and defendant immediately began screaming loudly. He said: "'You better not be talking to the fucking police.'" He also said "'listen'" and "'don't

4

talk to the fucking police.'" Defendant was "so loud," and "Jane Doe was upset . . . ." The officer took the phone and identified herself as a police officer. Defendant began screaming at her. He was "[v]ery loud and angry." The officer terminated the call, but defendant called back several times. His calls were not answered. Amezcua asked for an emergency protective order, and the officer obtained one for her.

## II. Defense Case At Trial

A defense investigator testified that Amezcua had told him during a 2012 telephone interview that the prior incidents did not involve violence by defendant against her. She told him that she had cut herself in October 2011 while chopping vegetables. Amezcua described the April 2012 incident as one in which she hit defendant and he was only trying to defend himself when her lip got cut. Amezcua told the defense investigator that there had been no other incidents of violence between her and defendant. She denied her statements to the police officers on those occasions. Amezcua told the defense investigator that she relied on defendant to help her take care of their children.

Defendant testified on his own behalf at trial and denied that he had ever been abusive to Amezcua. He insisted that Amezcua was "always accusing me of doing things." "She's always thinking I'm doing something wrong." Defendant testified that he was the victim "because I didn't do nothing," and Amezcua had lied on every occasion. "I'm the one getting attacked and getting the police called." He thought Amezcua was "[d]isrespectful" and "childish" toward him. The only thing he admitted was kicking in the door.

Although he admitted that he "plead[ed] to" the February 2008 domestic violence charge, he claimed he "didn't do anything" and had pleaded only "to get out of jail." Defendant testified that Amezcua had been in a fight with her sister, and he had not hit her or even touched her on that occasion.

5

He also denied responsibility as to Amezcua's October 2011 report of domestic violence. Defendant testified that this event was "[j]ust the same thing" as the others. "I woke up to her bleeding and her with a knife . . . acting like she going to poke me . . . ." No argument had preceded this event; he had simply been sleeping on the couch. Amezcua began yelling at him, telling him to leave, and saying "I'll stick you right now." "She's trying to swing a knife at me, and I just grabbed her hand down, you know, tried to get up out of there to get the knife out of her hand." He was not successful, so he "ran out of the house" with Amezcua "chasing me with the knife." Defendant claimed that "[t]hose charges were dropped" because "the District Attorney's Office knew she was lying about that case."

Defendant denied that he had been responsible for any domestic violence in April 2012. He claimed that Amezcua got mad at him and started hitting him. "I'm just protecting myself, not hitting her . . . ." After Amezcua inflicted "a gash" to his head and "busted" his lip and one of her blows "dazed" him, he "grabbed her" and "started pushing" her to get her to stop. Although he might have hurt her in the course of defending himself, he claimed "it wasn't intentionally." Amezcua said she was going to call the police and told him to leave, but he refused to leave. He did not tell the police that Amezcua was the aggressor because "they never listen to the guy," and he knew that he was "going to jail anyway" for the prior "incident where I was falsely accused."

Defendant's account of the August 2014 incident was that Amezcua came home from work with "an attitude" that led to an argument between them. She began "talking nasty" to him, and he asked to use her phone to call his mother. Amezcua called his mother names and refused to let him use her phone. He was "trying to grab the phone," they exchanged words, and she walked outside, told him to leave, and said she was going to call the police, which he testified she "always says." He began grabbing his clothes to get ready to leave, but Amezcua grabbed him and pushed him. He told her not to push him and that he was leaving, and she called the police. Defendant insisted that Jane was

6

not in the room at the time and that he "never put [his] hands on [Amezcua]" either intentionally or accidentally. He asserted that he was "scared" of Amezcua.

Defendant testified that the January 2015 incident was instigated by Amezcua because she "had an attitude" and was "treating me, like, I don't know, disrespectful . . . ." She "was trying to pick a fight with me," so he went to sleep. He said he had left the residence after Amezcua attacked him and threatened to call the police, and he "was just frustrated so I just kicked the door and left." While he minimized the damage he had caused to the door, he admitted that he had kicked the door one time and broken it. Once the door broke open, he left.

Defendant admitted that he had called Jane on the phone soon after he left, but he provided a different narrative of what he had said. He claimed that he had told *the officer* not to "play with" Jane and to "[l]et me talk to my daughter." He admitted that it was "possible" that he had told Jane not to talk to the police because "I don't like my daughter talking to no police." He testified: "I always teach all my kids that. Don't talk to nobody, no strangers, no police unless there's an adult around." He said that the purpose of his call was "[j]ust to tell her, . . . if the police come here, tell them the truth . . . that Mommy's hitting Daddy." "I'm telling her, Don't talk to the fucking police. I told the police don't talk to my fucking daughter."

### III. Discussion

#### A. Dissuading Instruction

##### 1. Background

The prosecution requested CALCRIM No. 2622 on the section 136.1, subdivision (b)(1) attempted dissuading count. The defense asked the court to modify CALCRIM No. 2622 to include an instruction on the "defense" based on the "presumption" set forth in section 136.1, subdivision (a)(3). The requested addition would have stated: "Evidence that the defendant was a family member who interceded in

7

an effort to protect Jane Doe shall create a presumption that the defendant acted without malice." The defense modification request also asked the court to modify the instruction to require a finding that "defendant *maliciously* tried to prevent or discourage Jane Doe from making a report that someone else was a victim of a crime to the police." (Italics added.)

The court denied the defense request. "I [am] denying the request to add that language for two reasons. Number one, it is not part of the jury instruction 2622 as contained in the CalCrim instructions. And, number two, . . . [i]t indicates that evidence that the defendant was a family member who interceded in an effort to protect the witness or victim shall create a presumption the act was without malice. [¶] I found that, in spite of [defendant's] testimony that he was only making those comments yelling on the phone because he advises his children not to talk to strangers, including the police, to be not credible. And it's my job to instruct the jury based upon what I think is the appropriate evidence. And I know defense counsel objects to that[,] feeling that it's the jury's job to determine that. And I disagree. So I feel that the comments made on the speaker phone was on that angry voice and clearly directed at this daughter, 'don't you talk to the fucking police' was not something that was said to protect his daughter. And that's the other reason, the second reason, why I'm not giving that part of the instruction."

The court instructed the jury with an unmodified version of CALCRIM No. 2622: "The defendant is charged in Count 3 with intimidating a witness in violation of Penal Code section 136.1. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant tried to prevent or discourage Jane Doe from making a report that someone else was a victim of a crime to the police. [¶] AND [¶] 2. The defendant knew he was trying to prevent or discourage Jane Doe from talking to police about what happened and intended to do so. [¶] As used here, witness means someone [¶] Who knows about the existence or nonexistence of facts relating to a crime.

8

[¶] It is not a defense that the defendant was not successful in preventing or discouraging the witness."

## 2. Analysis

The attempted dissuading count charged a violation of section 136.1, *subdivision (b)(1)*. Defendant's request for modification was based on the malice element of a section 136.1, *subdivision (a)* violation and the requirements for the presumption of the absence of malice set forth in subdivision (a).

Section 136.1 provides: "(a) Except as provided in subdivision (c), any person who does any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶] (1) Knowingly *and maliciously* prevents or dissuades any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law. [¶] (2) Knowingly *and maliciously* attempts to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law. [¶] (3) *For purposes of this section, evidence that the defendant was a family member who interceded in an effort to protect the witness or victim shall create a presumption that the act was without malice.* [¶] (b) Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶] (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge. [¶] . . . [¶] (c) Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances . . . ." (§ 136.1, italics added.)

9

Defendant acknowledges that the malice element and presumption do not appear in section 136.1, subdivision (b). Nevertheless, he argues that it defies "common sense" and "[t]here is no logic" to the Legislature's omission of a malice element from subdivision (b). He argues that the Legislature must have intended that "the family member presumption applies to all subdivisions of the section" because the subdivision (a) absence-of-malice presumption states that it applies "[f]or purposes of this section." He reasons that "[t]he presumption could not logically apply to subdivision (b) offenses if that subdivision were read to exclude a malice element," so "there is an implicit requirement that the prosecution prove appellant acted with malice as to the subdivision (b) offenses." Defendant fails to engage in the application of the rules of statutory construction to explain why we should construe section 136.1 to add a malice element to subdivision (b) that the Legislature omitted.

We exercise de novo review when we engage in statutory construction. (*People v. Brewer* (2011) 192 Cal.App.4th 457, 461.) "Statutory construction begins with the plain, commonsense meaning of the words in the statute, ' "because it is generally the most reliable indicator of legislative intent and purpose." ' [Citation.] 'When the language of a statute is clear, we need go no further.' " (*People v. Manzo* (2012) 53 Cal.4th 880, 885 (*Manzo*).) Where the language of the statute is potentially ambiguous, " '[i]t is appropriate to consider evidence of the intent of the enacting body in addition to the words of the measure, and to examine the history and background of the provision, in an attempt to ascertain the most reasonable interpretation.' [Citation.] We may also consider extrinsic aids such as the ostensible objects to be achieved, the evils to be remedied, and public policy. [Citation.] When construing a statute, 'our goal is " "to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' " ' " (*Manzo*, at p. 886.) "It is a settled principle of statutory interpretation that if a statute contains a provision regarding one subject, that provision's omission in the same or another statute regarding a related

10

subject is evidence of a different legislative intent." (*People v. Arriaga* (2014) 58 Cal.4th 950, 960.)

Here, the language of the statute is clear and unambiguous. Section 136.1 expressly sets forth a malice element as part of a subdivision (a) violation and as part of a subdivision (c) violation, but the plain language of subdivision (b) contains no malice element. "When language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful." (*In re Ethan C.* (2012) 54 Cal.4th 610, 638.) Although the presumption set forth in subdivision (a) applies to any malice element in the entire "section," that provision has no application to a subdivision (b) offense because a subdivision (b) offense has no malice element. As the plain language of the statute is clear, we need go no further. Even if we did proceed to inquire further, the legislative history of section 136.1 confirms that the presumption does not apply to a subdivision (b) offense and that no malice requirement may be imported into subdivision (b).

Section 136.1 was enacted in 1980, and it has always contained a malice requirement for subdivision (a) and subdivision (c) offenses and omitted such a requirement for subdivision (b) offenses. (Stats. 1980, ch. 686, § 2.1.) Section 136, which was enacted as part of the same act as section 136.1, contains a special malice definition that applies to section 136.1. (Stats. 1980, ch. 686, § 2.) "As used in this chapter: [¶] (1) 'Malice' means an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (§ 136, subd. (1).) Section 136.1 does not present a situation where a malice requirement must be implied because otherwise the statute would impose strict liability. Specific intent is required for all violations of section 136.1. (*People v. Young* (2005) 34 Cal.4th 1149, 1210.)

The Legislature's decision to omit a malice requirement from section 136.1, subdivision (b) while including it in subdivision (a) was not, as defendant claims,

11

illogical or nonsensical. Instead, it was reasonable. The Legislature could have reasonably concluded that a person who prevents or attempts to prevent a victim or witness from *attending or testifying at a trial or other proceeding* commits a crime only if the person did so with malice. For instance, the Legislature may have been concerned about potentially criminalizing the conduct of an employer who intentionally prevented an employee from testifying at a proceeding if the employer was motivated by the desire to keep the employee at work rather than by a malicious desire to thwart the administration of justice or to vex or annoy the employee. As a result, the Legislature may have wished to limit subdivision (a) offenses to those involving malice. No such concern arises with regard to a subdivision (b) offense since, even without a malice element, a subdivision (b) offense requires the perpetrator to intend to prevent a crime from even being reported by a victim or witness. The Legislature could have reasonably concluded that the limited scope of subdivision (b) did not need to be further narrowed by a malice requirement, particularly in light of the importance of encouraging reports to law enforcement.

The presumption was also reasonably limited to subdivision (a) and subdivision (c) offenses. The Legislature added the presumption to section 136.1 in 1997. (Stats. 1997, ch. 500, § 1.) The only two legislative analyses addressing the presumption confirmed that the presumption was not intended to apply to subdivision (b) offenses.[4] Section "1" of the September 9, 1997 Senate analysis provided a summary of the provisions of subdivision "(a)" and subdivision "(b)." This analysis then stated that the presumption would apply "for purposes of #1(a) above." That is, the Legislature explicitly recognized that the presumption would *not* apply to subdivision (b) offenses. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 940 (1997-1998 Reg. Sess.) as amended Sept. 8, 1997, p. 1.) The September 11, 1997 Senate analysis

---

[4] The presumption was added to the legislation very late in the legislative process.

12

similarly described the presumption as applying to subdivision (a) offenses, with no mention of subdivision (b) offenses. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 940 (1997-1998 Reg. Sess.) as amended Sept. 8, 1997, p. 1.) The Legislature could have reasonably concluded that the presumption was not necessary as to subdivision (b) offenses for the same reason that a malice requirement was not necessary for subdivision (b) offenses. Subdivision (b) already described a sufficiently narrow offense that did not require further restriction by means of a malice requirement or a presumption of the absence of malice. Furthermore, the Legislature could have reasonably concluded that it would be reasonable for a family member to try to protect a victim or witness from the trauma of attending a proceeding, but unreasonable for a family member to try to prevent a victim or witness from reporting a crime.

As the charged section 136.1, subdivision (b) offense did not have a malice element, and the presumption did not apply to it, the trial court did not err in refusing defendant's request for modifications to CALCRIM No. 2622.

## B. CALCRIM No. 850: Instruction on Expert Testimony Regarding Intimate Partner Violence

### 1. Background

Both the defense and the prosecution sought an in limine ruling on the admissibility of testimony by prosecution expert Richard Ferry on intimate partner violence. The court ruled that Ferry's testimony was admissible. Ferry, a psychotherapist, had not interviewed Amezcua or read any of the police reports in this case. He testified about "Intimate Partner Violence," which he explained had replaced the prior term, "Battered Women's Syndrome."

Ferry described the "three-stage cycle" of violence. The first stage was "'tension building.'" The second stage was "'acute violence.'" And the third stage was "loving contrition or remorse." During the tension stage, a victim might do something

13

provocative because the tension is "unbearable" and the victim wants to "get it over with." Victims stay in these relationships because they blame themselves and are taken in by the third stage of love and contrition. The cycle repeats itself, and increases its frequency, and the third stage becomes shorter and shorter and may disappear entirely. The victim often feels fearful, thinks that she is to blame, and hopes that things will get better if she changes her behavior. These feelings cause her to stay with the abuser. She also may stay with the abuser because she feels dependent on him or because she fears increased violence if she leaves.

Battered women commonly recant their allegations of abuse. This occurs in "75 to 80 percent of prosecutions in domestic violence cases nationwide." While doing so may appear self-destructive from the outside, the battered woman may see recantation as a way to "reduce his anger" and avoid further violence. She may also feel that she "cannot survive on her own," and she may still "be attached and in love with him." Recantation has several stages. During the first stage, "the two parties are really mad at each other." In the second stage, the batterer portrays himself as a victim and "plays for sympathy." During the third stage, he offers an alternative narrative in which she is to blame. The fourth stage involves nostalgia for the good parts of their relationship. In the fifth stage, the batterer asks the victim to recant.

Battered women often are hostile to the prosecution of the batterer, deny the statements that they have made to the police, and minimize the violence. Children who are exposed to domestic violence are "[p]rofoundly" affected, and often try to reduce the violence by taking on responsibilities in the household. Children also may minimize the violence because they "may be taking their clues from their mother . . . ." In addition, if the child is still in contact with the abuser's family, this may lead the child to minimize or recant. Battered women are usually most honest and accurate about abuse soon after an abusive event because there has not been time for "denial, repressing, [or] minimization

14

to kick in, nor has there yet been time for the abuser to persuade the abused." The same is true for children.

On cross, Ferry testified that he had observed situations where one intimate partner told lies about the other in order to get that person in trouble and also situations where the lies were told by one partner to get the other out of trouble. Blame shifting was not unusual in domestic violence situations. Ferry testified: "I'm only here to talk about the phenomenon surrounding domestic violence and the common experiences of battered people. If the jury heard my comments as proving this or proving that, that would be inappropriate."

The prosecution requested CALCRIM No. 850 on expert testimony about intimate partner violence. The defense did not object to the instruction or request that it be modified. The court instructed the jury with CALCRIM No. 850.[5] "You have heard testimony from Richard Ferry regarding the effect of battered women's syndrome and cycle of violence. [¶] Richard Ferry's testimony about battered women's syndrome and cycle of violence is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Janet Amezcua's conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony." The court also instructed the jury generally on witness credibility: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have."

The prosecutor discussed Ferry's testimony in her opening argument to the jury. "And we also know from Richard Ferry who talked to us about intimate [partner]

---

[5]     It also gave the jury CALCRIM No. 332, the standard instruction on expert witness testimony.

15

battering and violence that the best time when a person's going to be most honest about what happened is immediately after, before they have a chance for the abuser, the perpetrator, to come back in to start working on those stages of recantation to make up a story together." "What do you also know from Richard Ferry? Children involved in the intimate [partner] violence relationship? That, when it comes to the same gender, daughter/mother, they tend to model the behavior of the mom. They view it as supporting the mother in that relationship. And if a mom goes sideways, recants, starts giving a different version, most likely the daughter will too. You saw their demeanor and attitude on the stand." "[B]ased on what Mr. Ferry told us is, even with the stages of recantation, right, that victims who are in these relationships can minimize and they can deny. They'll admit some. They won't admit all. And it's all in an effort to protect the abuser. For whatever reasons, they may feel they'll prevent further violence against them or for other considerations because they have kids together, because they need the help, because they still love them." "[Y]ou heard from Dr. [*sic*] Ferry and he drew the chart, the effects of the cycle of violence without intervention just keeps going. The waves getting shorter and shorter. But the facts are, the victim, given enough time, is going to minimize what happened. The victim will deny what happened because, in their mind, the effects of being battered in an abusive relationship is they're going to try whatever they can to minimize it from happening again." "And what we also know from Richard Ferry's testimony is [the prior incidents of domestic violence] fits directly within the cycle of violence." "[W]e know, based on Mr. Ferry, without intervention, without treatment, without someone being arrested, without someone dying, it's just going to keep going on and on. It does not stop."

The defense responded in its closing argument: "And Richard Ferry painted a picture of [defendant] as an abuser. But Richard Ferry also has to concede that this constellation of control and constellation of abuse in between partners is a little bit bigger than just the possibility of one person hitting another. Richard Ferry agreed that it

16

includes character assassinations. That came out when I talked to him on cross examination. [¶] It's a method to control one's partner. They tell lies to the police which Richard Ferry told you about. And he's even seen it in his settings. He's seen it where folks will use the justice system to control and influence their partner. That's what's really happening here."

## 2. Analysis

Defendant contends that the trial court prejudicially erred in instructing the jury with CALCRIM No. 850 because the instruction told the jury that it could use Ferry's testimony "in evaluating the believability of [Amezcua's] testimony" and did not address Ferry's testimony about children.

Defendant claims that "this instruction advised the jury to presume Amezcua had been battered at some point to determine whether her testimony at trial denying the abuse and the truth of the police reports was a falsehood, and thus whether the abuse occurred." In his view, "[t]he jurors had two and only two choices: find Amezcua was believable at trial, which would have resulted in acquittal, or find [that] Dr. [*sic*] Ferry's testimony indicated her testimony was not believable, which would lead to the inference [that] the abuse occurred. The effect of the jury instruction was to tell the jury to use the [*sic*] Ferry's testimony to resolve the ultimate issue of whether the charged acts happened."

"In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).)

Defendant's argument is premised on his claim that the use of Ferry's testimony to evaluate Amezcua's "believability" amounted to the use of his testimony to "prove the occurrence" of the abuse. We reject this premise because it presumes that expert

17

testimony that may be used by the jury to assist it in evaluating the credibility of an alleged abuse victim is prohibited evidence of whether the abuse occurred. If the expert testimony was not related in some way to whether the abuse occurred, it would be irrelevant. Expert testimony may not be improperly used to *directly* determine whether the abuse occurred. But like much of the other evidence that comes in at a trial, it may be used *indirectly* to assist the jury in evaluating whether the alleged victim's statements are believable.

For instance, when an expert testifies about some abstract proposition, such as how long it would take for strangulation to produce unconsciousness, that testimony may be used indirectly to evaluate testimony by an alleged victim about the length of time she was strangled before she was rendered unconscious. If the expert's testimony is inconsistent with the alleged victim's testimony, the jury may use the expert's testimony to determine that the victim is not believable. If the expert's testimony is consistent with the alleged victim's testimony, the jury may use the expert's testimony to support a decision that the alleged victim's testimony is believable. The expert, who knows nothing about the facts of the case, is not giving testimony about whether the strangulation occurred. But his or her testimony is properly used to evaluate the believability of the alleged victim's testimony

The same is true here. Ferry, who knew nothing about the facts of this case, testified about abstract propositions. He explained how abuse victims often recant or minimize the abuse even when the abuse has in fact occurred. This information could properly be used by the jury to evaluate whether Amezcua's recantations and minimization of the alleged abuse was part of her reaction to abuse or was instead due to her having lied about the alleged abuse in the first place. While this use of Ferry's testimony related to Amezcua's "believability," it did not stray into a direct determination as to whether the abuse itself occurred. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 [battered woman syndrome evidence properly relevant to credibility].) All

18

evidence, including expert testimony, must have some relation to whether the charged offenses occurred or it would be irrelevant and excluded. The trial court did not err in instructing the jury that it could use Ferry's expert testimony to evaluate Amezcua's "believability."

Defendant also contends, in a subsection of his argument that the court prejudicially erred in giving CALCRIM No. 850, that the court prejudicially erred in *failing to give* a "limiting instruction" that applied to Ferry's testimony about child witnesses. His argument lacks a focal point. CALCRIM No. 850 specifically told the jury: "Richard Ferry's testimony about battered women's syndrome and cycle of violence is not evidence that the defendant committed any of the crimes charged against him." By generally precluding the jury from using Ferry's testimony as proof that defendant committed "any of the crimes charged," CALCRIM No. 850 served as a limiting instruction not only as to adult victim-witnesses but also as to child victims and child witnesses. The final sentence of the instruction, which is the one to which defendant objects, was limited to Amezcua: "You may consider this evidence *only* in deciding whether or not Janet Amezcua's conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony." (Italics added.) This sentence told the jury that Ferry's testimony was limited to evaluating "*Amezcua's* conduct" and "testimony." (Italics added.) Thus, the instruction *did* preclude the jury from using Ferry's testimony to evaluate *Jane's* conduct and testimony. Since CALCRIM No. 850 precluded the jury from using Ferry's testimony as to Jane, there is no merit to defendant's argument that the court erred in failing to give a limiting instruction.

## IV. Disposition

The judgment is affirmed.

_____

Mihara, J.

WE CONCUR:

_____

Greenwood, P. J.

_____

Elia, J.

People v. Brackins
H043584

Trial Court:                          Santa Clara County Superior Court


Trial Judge:                          Honorable Ronald I. Toff


Attorney for Defendant and Appellant:      Jill Kent
                                           Under Appointment by the Sixth
                                           District Appellate Program


Attorneys for Plaintiff and Respondent:    Xavier Becerra
                                           Attorney General of California

                                           Gerald A. Engler
                                           Chief Assistant Attorney General

                                           Jeffrey M. Laurence
                                           Senior Assistant Attorney General

                                           Eric D. Share
                                           Supervising Deputy Attorney General

                                           Elizabeth W. Hereford
                                           Deputy Attorney General


People v. Brackins
H043584