Filed 1/26/24; Certified for Publication 2/21/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RONALD GORDON FERENZ,<br><br>    Defendant and Appellant. | H049430<br>(Santa Clara County<br>Super. Ct. No. F1557971) |

Ronald Gordon Ferenz pleaded no contest to rape of an unconscious person, forcible rape, and dissuading a witness. The trial court sentenced Ferenz to a negotiated term of 12 years in state prison, and imposed a criminal justice administration fee of $129.75.

On appeal, Ferenz argues: (1) the trial court abused its discretion by denying his post-plea *Marsden*[1] motion; (2) the court erred by not striking certain exhibits attached to the prosecutor's Penal Code section 1203.01 statement of view; and (3) the criminal justice administration fee is unauthorized and must be stricken.[2] The Attorney General concedes that the fee must be stricken, but maintains that the *Marsden* motion was correctly denied and that the prosecutor's statement of view was properly accepted.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118.

[2] All statutory references are to the Penal Code, unless otherwise indicated.

We conclude that the trial court did not err in denying the *Marsden* motion, or by declining to strike portions of the prosecutor's statement of view. We agree that the criminal justice administration fee must be stricken. We will strike the fee and affirm the judgment as modified.

## I. BACKGROUND

### A. Factual Background[3]

During a forensic examination of Ferenz's phone, a video was found depicting Ferenz having sexual intercourse with Jane Doe 1, who appeared to be unconscious. Doe 1 was identified and interviewed. She told police that she met Ferenz when she responded to a room for rent ad on Craigslist. After smoking a marijuana cigarette she believed was " 'laced' " with something, she argued with Ferenz about not wanting to have sex with him. She woke up wearing a shirt and no pants the following morning in Ferenz's bed with no memory of exactly what happened.

Jane Doe 2 posted an ad on Craigslist seeking a room for rent. Ferenz picked her up, offered her an alcoholic drink, and drove her to his home. He gave her another alcoholic drink when they got to his house. Ferenz asked her to have sexual intercourse, but she declined. Doe 2 started feeling drowsy and began to fall asleep, but remained conscious enough to recall that Ferenz then had intercourse with her without her consent.

Jane Doe 3 met Ferenz on a dating app. In November 2015, she met him at his home about a room he had for rent. Doe 3 eventually told Ferenz she wanted to go home. Ferenz did not permit her to leave and raped Doe 3 with a foreign object.

Jane Doe 4 was identified after a video of her was found on Ferenz's phone. In the video, Doe 4 was seen begging Ferenz to let her leave. Doe 4 reported that she responded to a Craigslist ad that Ferenz posted looking for someone to do house and yard

---

[3] The factual background is derived from the probation report and the preliminary hearing in the case related to Doe 4.

work.  In an argument a week later, Ferenz choked Doe 4 and sodomized her with an unknown object.

Trinidad Zamaripa,[4] also known as "Gordy," was an acquaintance of Doe 4.  He sent her a text message indicating that they "could both get some money in our pockets." Zamaripa contacted Doe 4 and asked her whether she had any court dates related to Ferenz.  He then told her that there was an opportunity for both of them to "get some money in our pockets."  Zamaripa told Doe 4, "if you don't show up to court, you know, [someone] could put some money in your pocket and you would help us all out." Zamaripa stated that if Doe 4 did not appear in court, Zamaripa could stay at Ferenz's house and drive his truck, and Doe would receive at least $200 in cash.  Doe 4 declined the offer.  Zamaripa told Doe 4, "Good luck with that, homegirl."  About two weeks later, Doe 4's tent was set on fire while she was inside it.

### B. Procedural Background

Ferenz was charged by amended information with rape of an unconscious person (count 1; § 261, subd. (a)(4)); forcible rape (counts 2 and 8; § 261, subd. (a)(2)); assault with intent to commit rape (count 3; § 220, subd. (a)); forcible sexual penetration (count 4; § 289, subd. (a)(1)); forcible oral copulation (count 5; § 288a, subd. (c)(2)); assault by means of force likely to produce great bodily injury (counts 6 and 10; § 245, subd. (a)(4)); threats to commit a crime resulting in death or great bodily injury (count 7; § 422, subd. (a)); forcible sodomy (count 9; § 286, subd. (c)(2)(A)); felony false imprisonment (count 11; § 236); and dissuading a witness (count 12; § 136.1, subd. (c)(4)).  It was also alleged that Ferenz had a prior strike (§§ 667, subds. (b)-(i), 1170.12) and a prior serious felony conviction (§ 667, subd. (a)(1)).

Ferenz was represented by appointed counsel from the Independent Defense Office (IDO).  On November 18, 2020, Ferenz entered a plea of no contest to count 1

---

[4] Zamaripa's name is sometimes spelled Zamarippa in the record.  We use the former spelling, as it is used in the probation report.

(rape of an unconscious person), count 2 (forcible rape), and count 12 (dissuading a witness). Ferenz also admitted the prior strike allegation.

On February 18, 2021, Ferenz requested the appointment of new counsel. Following Ferenz's request, the trial court held a *Marsden* hearing outside the presence of the prosecutor, after which the court denied the motion. Ferenz indicated that he might move to withdraw his guilty plea, but did not do so. The prosecution struck Doe 4 from count 2 to effectuate the negotiated plea of 12 years in state prison.[5]

On August 12, 2021, Ferenz was sentenced to an aggregate term of 12 years under the plea agreement, consisting of six years for count 1, four years for count 2, and two years for count 12. The court also imposed various fines and fees, including a criminal justice administration fee of $129.75.

Ferenz timely appealed.

## II. DISCUSSION

### A. *Marsden* Motion

Ferenz argues that the trial court abused its discretion by denying his motion to substitute counsel. He asserts that "it is apparent that ongoing conflict between Ferenz and his appointed counsel resulted in the deterioration of the attorney-client relationship to the point where there was a complete breakdown in communication." The Attorney General argues that the trial court properly denied the motion. We conclude that the trial court did not err by denying the *Marsden* motion.

---

[5] After Ferenz entered a no contest plea to counts 1, 2, and 12, it appears the probation department determined that it was not possible to lawfully sentence him to the negotiated 12-year prison term with the charges as pleaded. The clerk's minutes reflect that the parties at one point stipulated to substitute count 6 for count 12. Ultimately, the plea agreement was satisfied by striking any reference to Doe 4 from count 12, and the original plea was allowed to stand.

### 1. The *Marsden* Hearing

After Ferenz notified the trial court he wished to substitute appointed counsel and withdraw his no contest plea, the court conducted a hearing outside the presence of the prosecutor. Ferenz stated he was initially very impressed with counsel. She was "active" in the case, and Ferenz reported, "I could call, basically, at any time and she took information," and she also would visit him. However, their "relationship got sour" around the time they were preparing for one of the three preliminary hearings in his case. Ferenz stated he would call counsel's office and "there was . . . no answer at all." Ferenz sent counsel a letter accusing her secretary of being "busy on the line with her boyfriend or something . . . ." Counsel responded with a letter that Ferenz thought was "pretty rude," though he admitted he "deserved part of it."

Ferenz also raised other complaints about counsel. He indicated that she did not do enough to get him necessary medical care that he requested. He asserted that counsel failed to interview his mother, who could be a favorable witness regarding certain exonerating facts related to his prior strike conviction. Ferenz complained that a tablet computer provided by the IDO to review discovery was taken away twice, and ultimately never returned. He stated that counsel's investigator was taken off his case and he never received an explanation about why this happened. Ferenz stated there had been no replacement investigator put on his case.

Ferenz asserted that defense counsel's actions caused the filing of witness intimidation charges against him. Trinidad Zamaripa was housed in Ferenz's dorm at the county jail, and told Ferenz that Doe 4 had "thrown cases on a lot of people." Ferenz informed counsel of this, and she and her investigator spoke with Zamaripa. Zamaripa was then charged with various crimes related to setting fire to Doe 4's tent. Ferenz was charged with witness intimidation. Ferenz felt that the investigator's interview of Zamaripa led to the new charge. He also asserted that defense counsel later denied that she and the investigator had attempted to connect with Doe 4 through Zamaripa. Ferenz

5

felt that he was "thrown under the bus," because counsel did not adequately assert that he had nothing to do with Zamaripa's actions.

As a result of the charges filed against him, Zamaripa reached a proffer agreement with the district attorney in which he provided information about Ferenz's case. Counsel advised Ferenz that she could not persuade a jury that he was not guilty because of this information. Ferenz asserted that Zamaripa obtained the information from police reports stolen from their mutual jail housing unit. Ferenz believed counsel no longer "felt I was innocent in my case."

Counsel responded to Ferenz's claims. She stated there had been three preliminary hearings in this case, and that prior to the COVID-19 pandemic, she visited him in jail on at least 10 occasions, with each visit lasting multiple hours. After the pandemic commenced, she reported having 11 separate interviews with Ferenz on Zoom over the course of about 5 months. She did not visit the jail itself during this time because of safety concerns resulting from the pandemic.

The letter that Ferenz sent regarding her secretary "was right after COVID hit, everything was kind of crazy . . . and we were trying to figure out what to do with [his case]." Counsel indicated that Ferenz was agitated and made accusations that her secretary was sexually inappropriate with other men in the jail. Counsel told Ferenz she would not tolerate his behavior. Ferenz apologized and the two worked productively thereafter.

Counsel explained that Ferenz's tablet was removed once to "update it, because we had new discovery." Damage was later discovered while the table was being charged. The policy of the IDO is that "if somebody damages the tablet, that it is a privilege and not a right, and it will be removed from them." Counsel informed Ferenz that she would provide him paper discovery for anything that he wanted to see. She also explained that she and Ferenz had already reviewed all of the discovery, as the case had been ongoing for about two years.

Regarding Ferenz's complaint about the investigator's removal, counsel explained that the investigator with whom Ferenz felt most connected was not removed from the case until Ferenz entered his no contest plea to the charges. Addressing Ferenz's medical care, counsel explained that she laid the groundwork for a motion requesting an order to transport Ferenz to a medical appointment. Ferenz, however, failed to identify a specific doctor after being asked to do so on multiple occasions. This information was necessary for counsel to obtain a transport order for medical care from the court. Counsel indicated that her investigator interviewed Ferenz's mother, obtaining mitigation evidence regarding Ferenz's priors and his childhood in preparation for a *Romero*[6] motion to strike Ferenz's prior conviction. The information was not used as the parties reached a negotiated settlement for a set prison term.

Addressing Ferenz's complaint regarding Trinidad Zamaripa, counsel explained that her investigator interviewed Zamaripa about Doe 4's background and history of accusations. Zamaripa was told not to contact Doe 4 and to let the investigator do so. He was told that if he did happen to see Doe 4, to give her the investigator's business card. Months later, Doe 4's tent was set on fire, and law enforcement identified Zamaripa as the suspect. After being criminally charged, Zamaripa offered to testify against Ferenz. In his proffer to the district attorney, Zamaripa stated that Ferenz admitted to "repeatedly raping this woman," and he knew "graphic details" about the crimes alleged against Ferenz regarding Doe 4 that were not in the police reports. Counsel explained to Ferenz that there was "too much evidence at this point for [her] to convince the jury," and that his sentencing exposure was "huge." She also indicated to Ferenz that the best way to address Zamaripa's testimony was to cross-examine him at trial.

Despite the *Marsden* motion, counsel asserted that she and Ferenz worked "very well together." She recognized that he maintained his innocence, and that pleading no

---

[6] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

contest to the charges was a "hard thing" for him. She stated, "I think he's fighting for his life," and that she did not take his complaints about her performance personally.

In response, Ferenz stated he "still appreciate[d]" counsel, and had faith in her. He explained he was upset about misunderstanding some of what happened in his case and about a lack of communication. He characterized counsel as "very professional," but stated that she sometimes "forgot things" that she promised to provide to him, which led Ferenz to panic. He stated she "did a brilliant job in my last prelim[inary hearing] . . . . She did a great job, and I want to use that to prove my innocence, you know." He did not agree with counsel's assessment of the strength of Zamaripa's potential testimony.

The trial court found that there was not a breakdown in communication between Ferenz and counsel, and found no conduct on counsel's part that fell below the standard of care. The court denied the motion for substitution of counsel.

### 2. Legal principles

"[C]riminal defendants are entitled under the Constitution to the assistance of court-appointed counsel if they are unable to employ private counsel. However, the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden*, *supra*, 2 Cal.3d at p. 123.) The trial court must permit the defendant to explain his contention and to relate specific instances of inadequate representation. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become "embroiled in such an irreconcilable conflict" that ineffective representation is likely to result. (*People v. Hart* (1999) 20 Cal.4th 546, 603.)

We review the denial of a *Marsden* motion for abuse of discretion. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.) The "denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney

8

would 'substantially impair' the defendant's right to assistance of counsel." (*People v. Webster* (1991) 54 Cal.3d 411, 435.)

### 3. Denial of the *Marsden* motion was not an abuse of discretion

Ferenz argues that his "ongoing conflict" with counsel "resulted in the deterioration of the attorney-client relationship to the point where there was a complete breakdown in communication." He asserts that his complaint is with counsel's conduct "outside the courtroom and her failure to honestly and consistently communicate with him regarding his defense." He highlights "five areas of concern": (1) counsel's office failure to take his phone calls; (2) the removal of his tablet computer; (3) the consequences of counsel's outreach to Zamaripa; (4) counsel's failure to "keep her promises," especially with respect to Ferenz's medical care; and (5) "a basic conflict over the defense of the case." He asserts that while individually these purported deficiencies might not amount to ineffective assistance of counsel, "there was a complete breakdown in communication" between Ferenz and his attorney that compelled substitution of counsel.

Our review of the record shows no abuse of discretion. The trial court's finding that counsel's performance did not fall below the legal standard of care is well supported. Counsel addressed Ferenz's complaints point by point. She confirmed she had spoken to Ferenz many times for many hours, both in person and, once the COVID-19 pandemic commenced, via videoconference; that the tablet computer removal was a matter of policy due to damage and that she provided a substitute means to review discovery; that she had done everything she could on her end to obtain Ferenz's medical care; that Ferenz's mother was interviewed; and that she had not done anything to encourage Zamaripa to burn down Doe 4's tent. "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation[s].' " (*People v. Smith* (1993) 6 Cal.4th 684, 696, citing *People v. Webster, supra,* 54 Cal.3d at p. 436.)

9

Ferenz asserts that there was a breakdown in communication between himself and counsel, and that good communication is "essential for constitutionally effective assistance." Counsel met many times with Ferenz, and the fact that she did not respond immediately to each of his concerns does not provide grounds for her removal. Ferenz argues that counsel's purported lack of communication caused him to panic, but a defendant "may not force the substitution of counsel by his own conduct that manufactures a conflict." (*People v. Smith*, *supra*, 6 Cal.4th at p. 697.) Further, Ferenz's assertion that communication had broken down between them was not shared by his attorney, who expressed sympathy for his circumstances and a willingness to continue to work with him.

Ferenz asserts that he and counsel fundamentally disagreed over his defense. However, a fair reading of the record indicates that although Ferenz asserted his innocence, he followed counsel's advice that a negotiated disposition was his best option given the strength of the evidence against him. Indeed, appointed counsel empathized with Ferenz and agreed that it was difficult to so advise him. It was only after entering the pleas of no contest that he moved to substitute counsel. Notably, Ferenz did not assert that his decision to plead no contest was obtained through misrepresentation, coercion, or even pressure by counsel. Rather, he expressed admiration for counsel's courtroom advocacy, and wished he could utilize her skills to assist him to fight the case at trial. Ferenz's regret over his decision to enter into the negotiated resolution of his case does not establish that there was an irreconcilable conflict between him and appointed counsel.

In sum, we find no basis to conclude that the trial court abused its discretion by denying Ferenz's motion to substitute counsel.

## B. Section 1203.01 Statement of View

Ferenz argues that the trial court erred by declining to strike extraneous material attached to the prosecutor's statement of view. Ferenz asserts that the material was

10

impermissible under the statute, and its inclusion violated the hearsay rule, his constitutional right to confrontation, and his right to due process. The Attorney General argues that the trial court properly allowed the material to be included, and that Ferenz's other claims about the material are meritless.

Based on the plain language of the statute, we conclude that the challenged material was not expressly precluded and that the court had inherent authority to accept the material. The trial court therefore did not err by declining to strike or remove it. We determine that Ferenz's hearsay, confrontation clause, and due process claims are premature.

### 1. Background

Prior to sentencing, the prosecutor submitted a statement of view pursuant to section 1203.01. The prosecutor did so to "assist the Department of Corrections and Rehabilitation in their efforts to rehabilitate Mr. Ferenz and provide him with relevant sex offender treatment and, to the extent such treatment during his period of incarceration proves ineffective, to assist the Department in evaluating Mr. Ferenz for further commitment as a Sexually Violent Predator [SVP]." The prosecutor believed that "such a commitment under the SVP Act will likely be necessary to protect the community from what appear to be Mr. Ferenz's pathological, violent, and sadistic sexual urges, which he appears to lack either the will or ability to control." Attached to the statement were sixteen exhibits, including police reports, district attorney investigative reports, interview transcripts, preliminary hearing transcripts, and records of Ferenz's prior convictions.

Ferenz filed objections and moved to strike all or portions of the section 1203.01 statement. While acknowledging that the prosecutor is permitted to file the statement, Ferenz argued it went "well beyond the scope of 'the crime committed' " because it included statements and exhibits related to uncharged conduct, dismissed counts, or allegations that were not substantiated. He also asserted that some of the material

11

included hearsay, and that the use of the material violated his confrontation rights, his right to due process, and his right to trial.

Prior to sentencing, the trial court heard arguments concerning Ferenz's motion and declined to grant it. The court stated, based on its "read of the statute, the police reports can be filed by the law enforcement agency, and so if the DA has permission to file those from the agency, then I think that they can file them." The court noted that this filing was "subject to, without prejudice, [a] defense motion to preclude some portion of it from consideration by whoever is going to be looking at it and making decisions." The court emphasized, "Any objection that you have can be raised on Mr. Ferenz's behalf at a later time."

### 2. Legal framework

Section 1203.01 provides, "(a) Immediately after judgment has been pronounced, the judge and the district attorney, respectively, may cause to be filed with the clerk of the court a brief statement of their views respecting the person convicted or sentenced and the crime committed, together with any reports the probation officer may have filed relative to the prisoner." (§ 1203, subd. (a).) It also provides, "The attorney for the defendant and the law enforcement agency that investigated the case may likewise file with the clerk of the court statements of their views respecting the defendant and the crime of which they were convicted." (*Ibid.*) The clerk shall immediately mail the statements and reports to the Department of Corrections and Rehabilitation (CDCR). (*Ibid.*) The purpose of section 1203.01 is to "create a postjudgment record for the benefit of [CDCR]." (*In re Cook* (2019) 7 Cal.5th 439, 452 (*Cook*).)

"We exercise de novo review when we engage in statutory construction." (*People v. Brackins* (2019) 37 Cal.App.5th 56, 65.) "Statutory construction begins with the plain, commonsense meaning of the words in the statute, ' "because it is generally the most reliable indicator of legislative intent and purpose." ' [Citation.] 'When the language of

12

a statute is clear, we need go no further.' " (*People v. Manzo* (2012) 53 Cal.4th 880, 885.)

### 3. Section 1203.01 does not preclude the prosecutor's statement of view and attachments

Ferenz argues that section 1203.01's "express provisions" only permit "the attachment of probation reports filed in relation to the prisoner.  He argues, however, that "[t]he statute does not provide for the attachment of any other types of documents such as police reports, preliminary hearing transcripts, district attorney investigative reports or other similar hearsay."  We disagree.

In *Cook*, *supra*, 7 Cal.5th at page 439, our high court considered the scope of a trial court's authority under section 1203.01 to preserve evidence for future use by CDCR.  (*Id.* at pp. 447, 455.)  The question in *Cook* involved "whether a sentenced prisoner whose conviction is final can seek the remedy of evidence preservation and, if so, by what means." (*Id.* at pp. 446-447.)  The offender in *Cook*, following *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), sought to make a record of mitigating evidence related to his youth for future use at a section 3051 youthful offender parole hearing.  (*Cook*, at pp. 446-447.)  The court held that a juvenile offender who is eligible for a youthful offender parole hearing but who was sentenced before the change in the law and thus was unable to provide the supplemental information contemplated in *Franklin*, may file a motion pursuant to section 1203.01, requesting "an evidence preservation proceeding as envisioned in *Franklin*." (*Cook*, *supra*, at pp. 452, 458-459.) The court concluded that "offenders with final convictions may file a motion in the trial court for that purpose, under the authority of section 1203.01," which the court construed as providing, postjudgment, trial courts with the authority to "generate, collect, and transmit information about the defendant and the crime to the Department of Corrections and Rehabilitation." (*Cook*, at p. 447.)

13

The court reasoned that "[w]hile section 1203.01 does not mention a *Franklin* proceeding to preserve evidence, neither does it prohibit one" (*Cook*, *supra*, 7 Cal.5th at p. 454), and "the court [nonetheless] has inherent authority under Code of Civil Procedure section 187 to authorize additional evidence preservation consistent with . . . *Franklin*." (*Cook*, at p. 447.) Thus, "section 1203.01, augmented by the court's inherent authority to craft necessary procedures under Code of Civil Procedure section 187, authorizes it to preserve evidence as promptly as possible for future use by the Board." (*Cook*, at p. 455.) Transmission of that record to CDCR, in turn, permits it to discharge its duty to later determine, using the youth-related factors under section 4801, subdivision (c), whether the offender is " 'fit to rejoin society' " as outlined in *Franklin*. (*Cook*, at p. 455.)

Here, there is nothing in the statute precluding the prosecutor from attaching reports, transcripts, or other documents. As in *Cook*, the court had the inherent authority to augment the record with material pertaining to the defendant and his offense for transmission to CDCR. (*Cook*, *supra*, 7 Cal.5th at pp. 446-447.) The prosecutor offered the material for use by CDCR to assess Ferenz for possible treatment as a sexually violent predator. Given that the purpose of section 1203.01 is the generation, collection, and transmission of relevant information concerning the defendant and the offense for use by CDCR, the trial court did not err by declining to strike or limit the prosecutor's statement of view. (See *Cook*, at p. 453 [concluding "it would be improper for the court to preclude a juvenile offender's chance to supplement the record with information relevant to his eventual youth offender parole hearing"].)

The language and structure of section 1203.01 suggest that the attached exhibits are permissible. The statute provides that "[t]he attorney for the defendant and the *law enforcement agency that investigated the case* may likewise file with the clerk of the court statements of their views respecting the defendant and the crime of which they were convicted." (§ 1203.01, subd. (a), italics added.) There is no apparent form that the law

14

enforcement agencies' "statement of their views" must take, and it very reasonably could include investigative reports and other information "respecting the defendant." Thus, given that section 1203.01 expressly permits law enforcement input, Ferenz's argument for an implied limitation on the form of the prosecutor's submission is not supported by the language of the statute itself.

Ferenz attempts to distinguish *Cook* by arguing that any possible inquiry into SVP evaluation is materially different from a youth offender parole hearing. Although *Cook* involved an attempt to make a record for a future youth parole hearing, the analysis in Cook "does not carve out an exception for youthful offenders" alone. (*People v. Crites* (2022) 77 Cal.App.5th 494, 499.) It "instead relies on the plain language of section 1203.01 in finding authority" for a court to consider augmenting the record. (*Id.* at p. 499.) Because the Supreme Court grounded its decision on the trial court's inherent authority to augment a 1203.01 statement, we see no basis to distinguish the case before us from *Cook*.

### 4. The trial court did not err by declining to strike or limit the prosecutor's statement of view

Ferenz argues that even if section 1203.01 permitted the prosecutor to attach investigatory reports, "those reports still must relate to the defendant and the crime or crimes of which he was convicted." He asserts that some of the materials related to crimes other than those to which he pleaded no contest and should have been excluded on that ground.

The issue whether a section 1203.01 statement of view is limited to material relating to the crimes to which a defendant pleaded no contest is answered by the plain language of the statute. Under section 1203.01, subdivision (a), the prosecutor may provide a statement "respecting the person convicted or sentenced *and* the crime committed." (§ 1203.01, subd. (a), italics added.) Thus, the statement may pertain *either* to the person convicted/sentenced *or* the crime committed. Ferenz's suggestion that the

15

material must only relate to the offense of conviction thus finds no support in the statutory language of section 1203.01. Furthermore, the material is plainly relevant to a future SVP evaluation. (See *People v. Superior Court* (*Coutren*) (2019) 41 Cal.App.5th 1001, 1010-1011 [noting SVP evaluations may include probation and police reports, as well as interview transcripts, investigative reports from prosecuting agencies, and arrest records].)

Ferenz also argues that inclusion of some of the exhibits in the statement of view violates the hearsay rule and deprives him of his confrontation and due process rights. But the exhibits were offered as part of the prosecutor's statement of view to be forwarded to CDCR for *possible* future use. Insofar as Ferenz's hearsay and constitutional challenges involve CDCR's future use of the material, the claims are not ripe for adjudication. (*People v. England* (2000) 83 Cal.App.4th 772, 780 [ripeness doctrine precludes courts from issuing " 'purely advisory opinions' " and is based " 'on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy' "].) Nothing prevents Ferenz from challenging the propriety of the attachments in a future proceeding should the material actually be used.

Finally, citing *People v. Williams* (2020) 57 Cal.App.5th 652 (*Williams*), Ferenz warns "[t]he wholesale dumping of voluminous quantities of hearsay into a statement of view is not only contrary to the legislative intent . . . it is also dangerous" because a section 1203.01 statement of view has "been held to qualify as 'reliable hearsay' admissible in postconviction resentencing proceedings."

In *Williams*, the court of appeal concluded that the superior court was permitted to rely on and consider hearsay in the section 1203.01 statement " 'provided there is a substantial basis for believing the hearsay information is reliable.' " (*Williams*, *supra*, 57 Cal.App.5th at p. 662, quoting *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1094-

16

1095.) The statement at issue in *Williams* was a " 'Statement by the Judge and District Attorney' " that was signed by the trial judge and deputy district attorney who prosecuted the case. (*Id.* at p. 656.) It included a description of the crime. (*Ibid.*) The *Williams* court found the hearsay sufficiently reliable because it was prepared as a substitute for a probation report, and as such, section 1203.01 required it to be prepared. Further, the defendant was given a full opportunity to also file a section 1203.01 statement, and thereby more opportunity to participate in the process than in the preparation of a probation report. (*Williams,* at p. 662.)

We distinguish the materials submitted by the prosecutor here from the statement submitted in *Williams*. The statement of view in this case was prepared solely by the prosecutor and includes investigatory reports and other materials supportive of the position of the prosecution and law enforcement. And as we note above, even though Ferenz's challenge fails here, he remains free to challenge the use of any of the material in the section 1203.01 statement of view on any ground should it be used in any future proceeding.

For these reasons, we conclude that section 1203.01 did not preclude the prosecutor's submission, and the trial court did not err by declining to strike or limit it.

### C. Criminal Justice Administration Fee

Ferenz argues, and the Attorney General concedes, that the criminal justice administration fee is unauthorized in light of Assembly Bill No. 1869 (2019-2020 Reg. Sess.), which rendered "unenforceable and uncollectible" any unpaid portion of certain enumerated fees, including the criminal justice administration fee, as of July 1, 2021. (§ 1465.9, subd. (a); see Stats. 2020, ch. 92, § 2.) The provision further requires "any portion of a judgment" imposing such fees to be vacated. (Gov. Code, § 6111, subd. (a).) Ferenz was sentenced on August 12, 2021, after Assembly Bill No. 1869 became effective. We therefore accept the Attorney General's concession and will modify the judgment to vacate the entirety of the criminal justice administration fee.

### III. DISPOSITION

The judgment is modified to vacate the $129.75 criminal justice administration fee.  As so modified, the judgment is affirmed.

_____
Greenwood, P. J.

WE CONCUR:


_____
Grover, J.


_____
Lie, J.


H049430
The People v. Ferenz

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SIXTH APPELLATE DISTRICT

THE PEOPLE,
Plaintiff and Respondent,
v.
RONALD GORDON FERENZ,
Defendant and Appellant.

H049430
Santa Clara County Super. Ct. No. F1557971

BY THE COURT:

The written opinion in the above-entitled matter filed on January 26, 2024, was not certified for publication in the Official Reports. Upon application of the Attorney General on behalf of respondent People of the State of California and good cause appearing, it is ordered that the opinion shall be certified for publication pursuant to rule 8.1105(b) of the California Rules of Court. It is therefore ordered that the opinion be published in the Official Reports.

(Greenwood, P. J., Grover, J. and Lie, J. participated in this decision.)

Date: _____          _____ P.J.

1

| Trial Court: | Santa Clara County Superior Court |
| | Superior Court No: F1557971 |
| | |
| Trial Judges: | The Honorable Edward Frederick Lee, |
| | The Honorable David A. Cena |

Attorneys for Defendant and Appellant
Ronald Ferenz:

Edward J. Haggerty
under appointment by the Court of
Appeal for Appellant

Attorneys for Plaintiff and Respondent
The People:

Rob Bonta,
Attorney General of California

Lance E. Winters,
Chief Assistant Attorney General

Jeffrey M. Laurence,
Senior Assistant Attorney General

Amit Kurlekar,
Deputy Attorney General

Claudia Harvey Phillips,
Deputy Attorney General

Brady A. Baldwin,
Deputy Attorney General

People v. Ferenz
H049430