Filed 3/10/21  P. v. Sloop CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES SLOOP,<br><br>Defendant and Appellant. | H047503<br>(Monterey County<br>Super. Ct. No. 18CR001912) |

A jury found appellant James Sloop guilty of falsely imprisoning his girlfriend by violence or menace, inflicting corporal injury on her, being a felon in possession of a firearm, twice dissuading his girlfriend from testifying against him, and several misdemeanor violations of protective orders that prohibited him from contacting his girlfriend and spouse.

On appeal, Sloop contends the prosecutor committed reversible misconduct in closing argument and the trial court erred by instructing the jury with CALCRIM No. 850 concerning expert testimony on intimate partner violence.  Further, regarding his sentence, Sloop claims a one-year prior prison term enhancement must be struck in light of Senate Bill No. 136 (2019-2020 Reg. Sess.) (Senate Bill 136) and that the trial court failed to knowingly exercise its discretion to impose concurrent sentences on the

convictions for dissuading a witness.  The Attorney General agrees with Sloop on his two sentencing claims.

For the reasons explained below, we reverse the judgment and remand the matter for resentencing in light of Senate Bill 136 and so that the trial court may exercise its sentencing discretion on the two convictions for dissuading a witness.  We reject Sloop's other claims of error.[1]

## I.  FACTS AND PROCEDURAL BACKGROUND

A.  *Procedural Background*

On January 14, 2019, the Monterey County District Attorney filed a second amended information (information) charging Sloop with kidnapping "Jane Doe"[2] (Pen. Code, § 207, subd. (a))[3]; count 1), inflicting corporal injury upon a cohabitant, Jane Doe (§ 273.5, subd. (a); count 2), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), three counts of dissuading a witness, Jane Doe, from testifying (§ 136.1, subd. (a)(1); counts 4–6), and five misdemeanor counts of contempt of court for violating a protective court order (§ 166, subd. (c)(1); counts 7–11).[4]

In connection with count 1, the information alleged Sloop had previously been convicted of a violent felony.  (§ 667, subd. (a).)[5]  The information also alleged Sloop

---

[1] In addition to the claims raised in this appeal, Sloop's appellate counsel has asserted four claims for relief in a separate petition for writ of habeas corpus (No. H048299).  This court ordered that the petition would be considered with this appeal, and we have disposed of the petition by separate order filed this day in case No. H048299.

[2] We refer to this victim as Jane Doe or Doe.  (See Cal. Rules of Court, rule 8.90(b)(4).)

[3] Unspecified statutory references are to the Penal Code.

[4] Counts 7 through 11 relate to violations that occurred between February 23, 2018, and April 5, 2018, and involved either Jane Doe or Sloop's spouse, who was referred to at trial as "Jane Doe 2."  We refer to Sloop's spouse as "Jane Doe 2" or "Doe 2."  (See Cal. Rules of Court, rule 8.90(b)(4).)

[5] The information, apparently in error, asserted this allegation arose under section 667.5, subdivision (a), rather than section 667, subdivision (a).  The parties and the trial court appear to have proceeded under the assumption that the allegation fell under section 667, and neither party has raised any issue on appeal with respect to the information.

had suffered two prior strike convictions (§§ 667, 1170.12) ("prior strike") and had served multiple prior prison terms for felony convictions (§ 667.5, subd. (b)) ("prior prison term enhancement"). The prior prison terms resulted from Sloop's previous convictions for robbery (§ 212.5), kidnapping (§ 207, subd. (a)), possession of a controlled substance for sale (Health & Saf. Code, § 11351), and possession of a controlled substance or drug paraphernalia in a detention facility (§ 4573.6).

On January 28, 2019, a jury found Sloop guilty as charged on counts 2 through 5 and 7 through 11. On count 1, the jury found Sloop not guilty of kidnapping but guilty of the lesser included offense of false imprisonment by violence or menace (§§ 236, 237). The jury also found Sloop not guilty on count 6. Sloop waived jury trial on the allegations in the information concerning his prior convictions, and the trial court found all the allegations true.

On October 10, 2019, the trial court struck one of the two prior strikes and sentenced Sloop to state prison for a total term of 17 years and eight months, comprised of six years on count 2, plus consecutive terms of one year and four months on count 1, one year and four months on count 3, four years on count 4, four years on count 5, and one year for one of the prior prison term enhancements. The court stayed the other prior prison term enhancements and struck the five-year prior serious felony enhancement (§667, subd. (a)) pursuant to its authority under section 1385.[6]

B. *Evidence Presented at Trial*

Sloop and Jane Doe dated for about two years before February 2018, and Doe was in love with Sloop.[7] In the early morning hours of February 23, Sloop and Doe were at

---

[6] Although the sentencing minute order states that the trial court imposed concurrent one-year jail terms for the misdemeanor convictions (counts 7–11), those sentences were not stated by the trial court on the record at Sloop's sentencing hearing. At Sloop's resentencing on remand, the trial court should impose sentences on the misdemeanor convictions.

[7] Unless otherwise indicated, all dates occurred in 2018.

Doe's father's house in Monterey. There, Sloop got into an argument with Doe's cousin. Soon after, Doe and Sloop left the residence in Sloop's car. Regarding what occurred inside the house and after Doe and Sloop left, Doe gave one account a day later to a Monterey County Sheriff's Office detective, Aly Najem, and a different account almost a year later when she testified at Sloop's trial.

Detective Najem testified that around noon on February 23, he attempted to stop a BMW being driven without a front license plate. Najem could not see who was driving the car, but it turned out to be Jane Doe driving Sloop's car. Doe sped away when Najem turned on his patrol car's overhead lights. After a brief pursuit, the BMW crashed into a Caltrans truck, and the BMW's airbag deployed.

Doe got out of the car and immediately collapsed. She had a red mark on the bridge of her nose and appeared to be under the influence of an opiate. Doe told Najem that she had used heroin and methamphetamine. Doe was transported to a hospital and booked into the county jail later that afternoon.

Detective Najem searched the BMW and found, among other items, a loaded gun under the left side of the driver's seat, a hypodermic syringe (apparently containing heroin) in a driver's door compartment, other drug paraphernalia, and women's clothing in the passenger compartment and trunk. Sloop's fingerprints were not located on the gun, and DNA found on the gun did not match Sloop's DNA.

Around noon on February 24, Detective Najem interviewed Jane Doe at the county jail about the preceding day's events. Doe said she fled from Najem because she was afraid of being arrested for outstanding warrants. When Najem initially asked Doe about the gun, Doe twice failed to respond and looked away. She also said she did not know anything about the gun. When shown a picture of the gun and asked if she had seen Sloop with it, Doe nodded her head, which Najem took as an affirmation that she had. When asked about her relationship with Sloop, Doe said she was in love with him, but he had some "problems" and what he had done to her was not okay. Doe also said

4

other domestic violence had occurred during her relationship with Sloop, but the latest incident was the worst.

Detective Najem asked Doe what happened between her and Sloop on February 23. Doe initially refused to answer but then talked about the incident. Doe recounted that Sloop got into an argument with her cousin. Sloop pointed the gun at her cousin; this action frightened Doe and caused her to run out of the house to Sloop's car. Shortly thereafter, Sloop exited the house, got in the car, and started driving away. Doe told Sloop she did not want to go with him and wanted to get out of the car. Sloop said Doe could get out but he would not stop the car; instead, he accelerated. Doe opened her door but decided not to get out of the moving car because she feared injury. The pair drove to a 7-Eleven about two miles away from the house. Sloop went inside the store while Doe waited in the car.[8] Doe told Najem that she stayed in the car because Sloop had calmed down. After they left 7-Eleven, Sloop drove to an area that had little traffic at that time of day. Sloop accused Doe of infidelity, called her a stupid bitch, and hit her hard approximately three or four times. Doe covered her face to protect herself.

During the interview at the jail, Detective Najem did not see the red mark he had observed on Jane Doe's nose the previous day. However, Najem saw some swelling and a bruise on the left side of Doe's face. Doe said that injury was caused by Sloop hitting her, not by her face striking the car's airbag during the collision with the truck.

A district attorney's investigator testified that about one hour before Jane Doe fled from Detective Najem on February 23, Doe sent a text message to a county jail inmate named Cameron Ferguson. The message included the following: " 'Now, yeah, yesterday was F-U-K-E-D up. Remember what Joe did to Maria across from airport and she was acting all scary? Yeah. Well, Jimmy did that to me. But he was tripping hard

---

[8] The store's surveillance video showed that Sloop and Doe were there around 2:30 a.m., and Sloop bought a cigarette lighter.

5

and went Tudy and Sam style on me. Yeah. Not cool.' " (Spelling and grammatical errors in original.)

Jane Doe testified that she had pleaded guilty to felony evading an officer and was granted probation. Doe said that on February 23, she was living at her father's house, and Sloop stayed there on some nights. In the early morning hours of February 23, she, Sloop, her cousin, and two or three other people whom she did not know were at the house. They were using drugs, including heroin and "crystal." Doe's father was asleep. Sloop and Doe's cousin got into a loud argument in Doe's bedroom. Doe was afraid the arguing would wake her father. Doe asked Sloop and her cousin to stop or be quiet, and Doe exited the house. Doe did not see any guns and never saw Sloop with a gun. Doe got scared when her father came out of the house very upset. She jumped into Sloop's car. Sloop also got in the car. Sloop asked Doe to go back inside the house to get his laptop, but she said no.

Jane Doe was upset with Sloop because she thought her father would not want them back and they were going to be "out in the street." After driving away from the house and stopping to talk, Sloop and Doe drove to a 7-Eleven. On the way, Doe opened her door to get Sloop's attention and express her frustration; she was "just overreacting" and not trying to get out of the car. After Sloop purchased a lighter and returned to the car, Doe got out of the car and smoked a cigarette.[9] Sloop and Doe then drove for a time, parked in a neighborhood around Jacks Peak, and argued. Sloop started driving again, stopped, grabbed Doe's purse, and threw some of its contents out the window, causing Doe to cry. Sloop did not hit Doe at either stop. In addition, Sloop had never hit Doe before, and there had never been any prior domestic violence between them.

Sloop and Jane Doe eventually returned to her father's house. Thereafter, Doe left with her belongings in Sloop's BMW to go to her grandmother's house. Doe did not

[9] The store's surveillance video, however, showed the BMW leaving the area within seconds after Sloop exited the store.

6

know there was a gun in the car when she fled from Detective Najem. Between the time of her arrest and her trial testimony, Doe had exchanged several letters and text messages with Sloop and had video chatted with him two or three times. She also had received messages from Sloop through her family members.

During her direct testimony, Jane Doe answered multiple questions about her statements to Detective Najem by saying that she could not recall whether she actually had made those statements. For example, Doe testified that she did not remember telling Najem that (1) she saw Sloop point a gun at her cousin; (2) she got scared and ran outside when she saw them fighting; (3) Sloop accelerated when she opened the car door; (4) she was scared of Sloop, did not want to leave the house with him, and tried to get out of the car; (5) Sloop hit her hard approximately three or four times and she tried to cover her face; (6) Sloop had problems and what he had done was not okay; and (7) she had seen Sloop with a gun. In addition, Doe testified that she was not sure whether she had told Detective Najem there had been prior domestic violence incidents. Doe denied telling Najem that the bruise on the side of her face was caused by being punched.

On cross-examination, Jane Doe said that when Detective Najem interviewed her he immediately told her that he thought she was a victim. Doe felt that if she was a victim, she might get leniency in her own case, which was the most serious criminal charge she had ever faced. Doe simply agreed to a lot of what Najem said during the interview, including whether the gun in the car was Sloop's. At the time of the interview, Doe was still coming down from the drugs she had taken and, at trial, she did not have a good recollection of the interview.

Alexandria Tara McCabe (Tara McCabe) testified as an expert in the psychology of intimate partner violence.[10] McCabe was unaware of the facts in this case and was

---

[10] McCabe testified about her background and qualifications. This testimony is the subject of Sloop's petition for writ of habeas corpus, which we have addressed by separate order this day.

called to testify generally about her training and experience working with victims of intimate partner violence.

According to McCabe, under the "Duluth model," "[t]he cycle of violence" usually starts with a "honeymoon period" when people are getting to know each other. Typically, the abuser wants intimacy and commitment quickly and to control the activities of the victim. This period is usually followed by a period of tension and then an escalation of violence, which may include threats of harm to the victim's family or other actions to prevent the victim from seeking help. After a violent incident, the abuser typically shows remorse, which is followed by a return to the honeymoon period. The cycle then repeats and tends to get shorter and more dangerous.

The abuser often will keep close tabs on the victim's contacts and activities. The abuser may maintain power and control through acts of apparent love or service and promises to marry or further the relationship. Cultural, religious, familial, economic, and emotional barriers can make it difficult for the victim to leave the relationship.

It is "very common" for an abuser who is charged with a domestic violence crime to tell his victim about the charges and the possible sentence or other potential ramifications. Providing such information is "a way of making the victim feel guilty" and "ashamed that they came forward" to report what had happened. According to national statistics, three out of five women will be victimized by domestic violence before the age of 30. Based on McCabe's experience as a victim advocate, younger people may not "have a point of reference" to know that their experiences are not "how life has to be."

McCabe described a case from Seattle in which a woman was granted a restraining order based on death threats. Thereafter, police seized a gun, but the perpetrator was granted supervised visitation with a child by a civil court. At the next visit, the perpetrator murdered the woman and the child. According to McCabe, it is hard to predict what will happen in domestic violence situations and "some cases get very lethal

8

very quickly." The presence of weapons increases lethality and the "recidivism rate" for domestic violence abusers "is very high."

Victims of domestic violence sometimes use drugs to "numb[] themselves from the whole escalation of violence." It is "very common" for victims of domestic violence to not report every incident to the police. A victim may provide information more readily if someone else contacted the police. It is "more common than not" for a victim to make a report and then refuse to cooperate with authorities. A victim may "flip[] on the stand" by not talking about what happened or just denying anything happened—all of which is part of the violence cycle. "[R]ecanting and minimizing" are "very common" and happened "more often than not" in the cases on which McCabe worked. Further, it is "very common" for victims of trauma to recall only certain details of what happened to them. McCabe has seen victims apologize to the abuser "in almost all of the cases that [she] dealt with." McCabe has also seen victims help the abuser by paying bail, trying to rescind a no-contact order, and going back into the abusive relationship.

On cross-examination, McCabe acknowledged that she testified about "a lot of generalities" and, given her lack of knowledge regarding this case, she could not provide an opinion about why the people in this case may have behaved as they did.

A police officer from the Seaside Police Department testified about an incident on September 8, 2016, involving Sloop and his estranged spouse, Jane Doe 2. Doe 2 reported to police that Sloop had broken into her home. Police officers went to the home and observed a broken window and open doors. The officers found Sloop hiding in the backyard. Sloop told the police that Doe 2 had accused him of cheating, the door locks had been changed, and he broke the window. The officers served Sloop with a restraining order that Doe 2 had obtained previously. Sloop left, and Doe 2 returned home. While the officers were still at the home, and within 15 to 20 minutes after serving Sloop with the restraining order, Sloop called Doe 2 and "said something to the effect of, 'I can't believe you're doing me like this,' " " 'I'm going to kill you,' " and,

9

" 'I'm stressing. I'm so sorry.' " In addition to making this call, Sloop had called Doe 2 at least five other times after being served with the restraining order. Subsequently, on September 12, 2016, police officers returned to the home and found Sloop hiding inside. The officers arrested Sloop.

Regarding the charges for violating protective court orders between February through April 2018, the district attorney's investigator testified that Sloop contacted Jane Doe 2 from jail over 400 times via text message or video call.[11] In addition, Sloop made approximately 123 text, phone, or video contacts with Jane Doe.[12]

Regarding the charges that Sloop dissuaded Jane Doe from testifying, a recorded video call established that on February 27, Sloop asked a person named Robert Manni to contact Jane Doe and tell her that " '[w]hatever she says is going to' [] 'cost [Sloop his] life.' " Within minutes after this video call, Manni talked by video with Jane Doe (who was in jail) and then engaged in another video call with Sloop. Shortly thereafter, Manni sent a text message to Doe stating: " 'Please understand the life-threatening situation that the man that you say that you love and care for is being put into. James has always been there for you in your times of need. In good times and bad times. He loves you and cares for you the way a man is supposed to care for a woman that he loves. [¶] [] . . . . Now, I don't want you to feel overwhelmed by what needs to be done. But, in all honestly [*sic*], it may very well feel that way at times. Now the D.A. is threatening James with life in prison. And if the truth doesn't get brought to light, life is coming over [*sic*] for him. But his life can be saved, [Jane Doe]. The truth can save James's life. Just tell the D.A. the truth, [Jane Doe], please. Please. [¶] In real talk, it's understood what's being asked of you. You'll have to give up a year of your life. But you'll be saving the man's life,

---

[11] Inmates housed in the county jail could phone, text, and video call people on the outside. All communications were recorded and monitored.

[12] In his closing argument, Sloop's defense counsel conceded the five misdemeanor protective order violations alleged in counts 7 through 11.

who you say you love. You could make it happen, [Jane Doe]. Just tell the truth, that James was asleep and didn't have anything to do with what happened. Do what you know is right in your heart.' "

In addition, on March 2, Sloop sent a text message to an account registered to "Jaamine Pruyne."[13] The message read: " 'So ask Spence any word on that ask. If you could call and tell her that I really could get life. They're charging me with kidnapping, which carries life.' " Manni responded a few hours later asking Sloop to call him. The next day, Sloop sent another text message to the Pruyne account stating: " 'Hey, please call girl again and let her know I'm being charged with kidnap. And they put a restraining order for us. Why? And damn it -- damn. I'll always love her. And I've been good to her for the most part. And I'm sorry for the mistakes I've made. But in the end it was all love on my part. And I'm sorry. Please don't allow me to get the rest of my life, because I don't deserve that. Please. Thank you. Then call me.' "

Sloop did not testify or present any witnesses in his defense.

## II. DISCUSSION

Sloop raises four claims of error in this appeal. Sloop asserts the prosecutor committed reversible misconduct in closing argument. He further argues the trial court erred by instructing the jury with CALCRIM No. 850 concerning expert testimony on intimate partner violence. Regarding his sentence, Sloop contends the prior prison term enhancement must be struck in light of Senate Bill 136. Sloop also asserts on remand the trial court should conduct a full resentencing and should exercise informed discretion on whether to impose concurrent sentences for counts 4 and 5. We address Sloop's claims in turn.

---

[13] Manni used the account of "Jaamine Pruyne" to communicate with Sloop in jail. Manni also used the alias "Spence."

A. *Prosecutorial Misconduct in Closing Argument*

Sloop claims that the prosecutor committed prejudicial misconduct by "unconstitutionally compar[ing] the defense to Donald Trump and his 'fake news' rhetoric, while supposedly adopting the Obama mantra – when they go low, we go high" and "impermissibly vouch[ing] for the integrity of the prosecution team" by saying, " 'We don't do personal attacks here.' "

The Attorney General counters that Sloop forfeited his claim by failing to object at trial on the grounds he now asserts on appeal and by not requesting an admonition at the time of the alleged misconduct. Further, the Attorney General argues that Sloop's claim lacks merit and the prosecutor's conduct was not prejudicial.

1. Background

In his closing argument, defense counsel addressed the prosecutor's failure to ask Jane Doe questions about her pre-arrest text message to jail inmate Cameron Ferguson referencing what " 'Jimmy did' " to her. Defense counsel remarked that the prosecutor "doesn't care about the truth. She'd rather speculate. It's better to speculate for her." The prosecutor objected to this comment and the trial court sustained the objection. Thereafter, outside the presence of the jury, the trial court admonished defense counsel that "the personal attack on the D.A. was inappropriate." Defense counsel apologized, acknowledged his comment was inappropriate, and said he removed the comment from his PowerPoint presentation.

Defense counsel further argued to the jury that Jane Doe had "an incredible motive to lie" when she spoke to Detective Najem and that Najem gave Doe "an out" and "an opportunity" to obtain leniency by telling her she was a victim. Defense counsel asserted that Doe "concoct[ed] a story how these events all transpired." Counsel questioned whether Doe "actually sa[id] the things" Detective Najem testified to and argued that the jury could not know exactly what was said because Najem had not recorded the interview. Further, in response to argument by the prosecutor about the consistency

12

between the evidence and McCabe's expert testimony, defense counsel argued that McCabe "said whatever the District Attorney's Office wanted her to say" in an effort to "make their case stronger."

After defense counsel completed his closing argument, the prosecutor began her rebuttal argument by saying, "That was a lot. By my count, I'm a liar. Jane Doe's a liar. The Court made [an] impermissible ruling, which is the --." Defense counsel interrupted the prosecutor saying, "Objection. I didn't say that." The trial court sustained the objection. The prosecutor continued, "The officers in this case lied, the expert who knows nothing about this case was coached and then spoon fed you what we cooked up in our office. That was a lot. *Depending on your political leanings, fake news, or when they go low, we go high. We don't do personal attacks here.*" (Italics added.) Defense counsel interjected, "Objection; that was a personal attack." The trial court sustained the objection, and the prosecutor next said, "The evidence in this case is what we're going to focus on."

### 2. Legal Principles

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.] 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.)

" ' "[A] prosecutor is given wide latitude to vigorously argue his or her case" ' [citation] and ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480 (*Rodriguez*).)

13

" 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.] Referring to facts not in evidence is 'clearly' misconduct 'because such statements "tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination." ' " (*Ibid*.)

" 'Prosecutorial misconduct requires reversal when it "so infect[s] a trial with unfairness [as to] create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury." ' " (*People v. Peterson* (2020) 10 Cal.5th 409, 464.)

Prosecutorial misconduct that violates state law is harmless unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070–1071; see also *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Federal constitutional error is harmless if, beyond a reasonable doubt, the error did not affect the outcome of the trial. (*People v. Cook* (2006) 39 Cal.4th 566, 608; see also *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

### 3. Analysis

Sloop contends the prosecutor committed misconduct because she "equated defense counsel and his argument with [former President Trump's] highly divisive, 'fake news' rhetoric. She then compared herself and her office with the Obama era slogan, 'When they go low, we go high.' Finally, she vouched for herself, her office and her expert witness when she claimed that '[w]e don't do personal attacks here.' "

We begin our analysis of Sloop's claim by considering whether Sloop adequately preserved his current argument that the prosecutor improperly compared the defense to then-President Donald Trump. As detailed above, after the prosecutor uttered her

statement about not " 'do[ing] personal attacks here,' " Sloop's defense counsel objected on the ground that the prosecutor's statement was a "personal attack." Defense counsel did not complain that the prosecutor's remarks equated him or the defense with President Trump's rhetoric or aligned the prosecutor and the prosecution team with the slogan articulated by Michelle Obama.

Notwithstanding Sloop's assertion that the jurors likely had a greater affinity for "the former president [i.e., President Obama] whose popularity seems to grow by the day in blue counties such as Monterey" than for the "divisive president," it is important to our analysis of forfeiture that the prosecutor never mentioned President Trump or the Obamas by name. If defense counsel had any concern that the prosecutor's remarks went beyond a limited "personal attack" on his advocacy and, instead, conjured a politically charged and grander equivalence between himself and then-President Trump—while aligning the prosecution team with the Obamas—defense counsel should have articulated that politically-based concern as a ground for his objection. Because counsel did not do so, Sloop's current claim regarding the alleged political comparison is forfeited. (See *People v. Stanley* (2006) 39 Cal.4th 913, 952 (*Stanley*) [" 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct' "]; *People v. Thomas* (2012) 54 Cal.4th 908, 938–939 (*Thomas*).)

Similarly, Sloop's argument that the prosecutor's comment " 'We don't do personal attacks here' " amounted to improper vouching is forfeited because defense counsel failed to object on that ground. Defense counsel objected by saying "that was a personal attack." Defense counsel's objection sounded in the prohibition on denigrating or disparaging opposing counsel, not in vouching. (See *People v. Hill* (1998) 17 Cal.4th 800, 820, 832 ["A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel."]; *People v. Sandoval* (1992) 4 Cal.4th 155, 184.) Accordingly, Sloop's current claim of improper vouching was not

15

preserved for appellate review.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 694, fn. 26; see also *Stanley*, *supra*, 39 Cal.4th at p. 952; *Thomas*, *supra*, 54 Cal.4th at pp. 938–939.)

Further, we are not persuaded by Sloop's argument that his failure to request an admonition should be excused here because "no admonishment would have cured the prejudicial effect of likening defense counsel's argument to Donald Trump's frequent claims of 'fake news.' "  In our judgment, the meaning of the prosecutor's remark is not as clear as Sloop maintains.  Sloop asserts that the prosecutor equated defense counsel and his argument with former President Trump's divisive rhetoric and juxtaposed that position against the more acceptable and advantageous Obama-related position espoused by the prosecution.  The prosecutor's remark, however, could reasonably be understood as characterizing the defense closing argument in a manner that does not connote this alleged Trump-Obama dichotomy.  In response to Sloop's assertion, the Attorney General argues that "the reference to 'fake news' " more plausibly could be understood "as an assertion that defense counsel's argument could not be trusted."  And in our view, the prosecutor's remark also could be interpreted to suggest that it was the defense who had tried to paint *the prosecution* as having peddled " 'fake news' " to the jury or, on the flip side of the same coin (depending on one's "political leanings"), the defense had tried to paint itself as having gone " 'high' " while *the prosecution* went " 'low.' "

Given the apparent ambiguity of the prosecutor's " 'fake news,' " " 'low' " versus " 'high' " remark, we conclude that an admonition to disregard the comment would not have been futile or drawn any additional negative attention to it.  Similarly, defense counsel should have requested an admonition when he objected to the prosecutor's brief comment about not doing "personal attacks here."  A basic admonition to the jury to disregard the prosecutor's comments would have cured any harm arising from them and, thus, was necessary to preserve Sloop's current prosecutorial misconduct arguments for appeal.  (See *People v. Bennett* (2009) 45 Cal.4th 577, 616; *People v. Centeno* (2014) 60 Cal.4th 659, 674.)

16

Even if we assume arguendo that Sloop's current challenge to the prosecutor's comments was properly preserved for appellate review, Sloop's arguments lack merit. "A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) Further, a "[d]efendant's challenges to rebuttal [argument] must be evaluated in light of the defense argument to which it replied." (*People v. Chatman* (2006) 38 Cal.4th 344, 386.) " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337.)

As explained above, the prosecutor's rebuttal remark about " 'fake news' " and going " 'low' " and " 'high' " is ambiguous. Although somewhat hyperbolic, the remark was limited, and the prosecutor ultimately followed up by saying, "The evidence in this case is what we're going to focus on." In our judgment, the prosecutor's remark was an inartful attempt at characterizing the defense closing argument but does not amount to misconduct. (Cf. *People v. Gionis* (1995) 9 Cal.4th 1196, 1216–1217.) Further, we conclude there is no reasonable likelihood the jurors understood or applied the remark in the way that Sloop claims, i.e., to equate his defense counsel with then-President Trump and convict Sloop "out of anger" rather than based on an impartial evaluation of the evidence. (See *People v. Edwards* (2013) 57 Cal.4th 658, 738.) Thus, Sloop has not met his burden to demonstrate prosecutorial misconduct that requires reversal of his convictions.

In addition, we reject Sloop's argument that the prosecutor improperly vouched for the for the integrity of the prosecution team by saying " 'We don't do personal attacks here.' " This brief comment about the prosecution's repudiation of " 'personal

17

attacks' "—though inappropriate and properly countermanded by the trial court upon the defense objection—did not suggest the prosecutor had particular " 'personal knowledge of facts outside the record' " that showed the prosecution witnesses were truthful. (*Rodriguez*, *supra*, 9 Cal.5th at pp. 480–481.)  Nor did it " 'invite[] the jury to abdicate its responsibility to independently evaluate for itself' " whether the prosecution witnesses should be believed.  (*Id*. at pp. 480–481.)  Rather, the prosecutor's comment more readily conveyed a denial by the prosecutor of any participation in personalized, disparaging attacks in court—by way of comparison to defense counsel and the personal attack he leveled on the prosecutor's integrity during the defense closing argument.  Further, immediately after the trial court sustained the defense objection to the prosecutor's comment, the prosecutor said "[t]he evidence in this case is what we're going to focus on."  Viewing the prosecutor's comment in context, we conclude that the comment did not amount to improper vouching based on extra-record evidence.

Similarly, although the comment suggested the prosecution was nobler than the defense because it "d[id]n't do personal attacks here," this alleged good behavior did not clearly convey that the prosecution either was aligned with the preceding, purportedly favorable "Obama mantra" or had some special reputation for veracity based on its position more generally.  (See *People v. Huggins* (2006) 38 Cal.4th 175, 206–207.)  Moreover, as noted above, immediately after making her comment, the prosecutor drew the jury's focus to the evidence.  For these reasons, we do not agree with Sloop that the prosecutor's comment amounts to improper vouching by invoking prestige or reputation.  In addition, there is no reasonable likelihood the jurors understood the prosecutor's comment repudiating personal attacks as urging them to set aside the evidence and decide the issues of credibility and Sloop's guilt based on the prosecution's prestige or reputation.  The jurors were instructed here that they "alone [] decide what happened, based only on the evidence" and they "alone must judge the credibility or believability of the witnesses."  On this record, we conclude Sloop has not demonstrated improper

18

vouching that requires reversal. (See *People v. Riggs* (2008) 44 Cal.4th 248, 302–303; cf. *Rodriguez*, *supra*, 9 Cal.5th at p. 481.)

In sum, we reject Sloop's claim of prosecutorial misconduct as forfeited and otherwise conclude it is meritless.

B. *CALCRIM No. 850*

1. Background

The trial court instructed the jurors with CALCRIM No. 850 regarding expert testimony on intimate partner battering and its effects as related to the credibility of a complaining witness. The jury instruction read: "You have heard testimony from Tara McCabe regarding the effect of Intimate Partner Violence. [¶] Tara McCabe's testimony about Intimate Partner Violence is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony."

At trial, Sloop did not object to this instruction—which had been requested pretrial by the prosecutor. In addition, Sloop affirmed in the trial court that the instruction was "given with the agreement of the parties."

On appeal, Sloop contends that CALCRIM No. 850 is "unconstitutionally misleading in two respects." First, he asserts that in a case "where the defendant's guilt turns on the complaining witness's credibility, it is impossible to allow the jury to use expert testimony about intimate partner battering 'in evaluating the believability of [the complaining witness's] testimony' [citation], without allowing them to also use it as proof that the victim told the truth." Second, he maintains that "because the instruction's limiting language refers only to 'the crimes charged against' the defendant [citation], the instruction does not preclude the jury from using intimate partner battering evidence as proof the defendant committed uncharged crimes, from which the jury can then impermissibly infer that the defendant was disposed to commit the charged crimes." In

19

addition, Sloop claims that the instruction violated his federal and state constitutional rights to due process by reducing the prosecution's burden of proof and, as to counts 1 and 2, was prejudicial under either *Chapman*, *supra*, 386 U.S. 18 (governing federal constitutional error) or *Watson*, *supra*, 46 Cal.2d 818 (governing state law error).

The Attorney General counters that Sloop forfeited his claim of error by failing to object to the instruction or request modification of it in accord with his current arguments. The Attorney General further contends that Sloop's claim fails on the merits. In support of his merits argument, the Attorney General principally relies on two cases that rejected similar challenges to CALCRIM No. 850, *People v. Brackins* (2019) 37 Cal.App.5th 56 (*Brackins*) and *People v. Sexton* (2019) 37 Cal.App.5th 457 (*Sexton*). Finally, the Attorney General asserts that any alleged error in the instruction does not present a federal constitutional issue and is not prejudicial.

### 2. Analysis

We begin by addressing forfeiture. Sloop argues that his failure to object "is not fatal" to his appellate argument because the trial court had a duty to correctly instruct the jury on the legal principles relevant to the evidence. Sloop further contends that an objection is not necessary when, as here, the instructional error affects a defendant's substantial rights.

Generally, a " 'party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 724.) Nevertheless, "[w]e may review defendant's claim of instructional error, even absent objection, to the extent his substantial rights were affected." (*People v. Townsel* (2016) 63 Cal.4th 25, 59–60; § 1259.) In light of these principles and Sloop's arguments, we will consider Sloop's claim on its merits because "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining

whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

Turning to the merits of Sloop's challenge to CALCRIM No. 850, we review de novo whether an instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 831.) Moreover, we presume that jurors are "able to understand and correlate instructions" and "have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

We are not persuaded by Sloop's primary argument that CALCRIM No. 850 "effectively permitted the jury to use the expert's testimony as evidence of [Sloop's] guilt." (Italics and capitalization omitted.) Sloop's complaint about CALCRIM No. 850 is similar to one that a different panel of this court rejected in *Brackins*, *supra*, 37 Cal.App.5th 56. In that case, the defendant likewise grounded his challenge to CALCRIM No. 850 on the premise that using expert testimony to evaluate the alleged abuse victim's believability amounted to use of that testimony to prove whether the abuse occurred. (*Brackins*, at p. 71.) This court explained that while expert testimony may not be used "to *directly* determine whether the abuse occurred," "it may be used *indirectly* to assist the jury in evaluating whether the alleged victim's statements are believable."[14]

---

[14] This court also referenced Evidence Code section 1107, subdivision (a), which states: " 'In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.' " (*Brackins*, *supra*, 37 Cal.App.5th at p. 71; see also *People v. Brown* (2004) 33 Cal.4th

(*Ibid.*) This court further observed that "[a]ll evidence, including expert testimony, must have some relation to whether the charged offenses occurred or it would be irrelevant and excluded" and then concluded that the "trial court did not err in instructing the jury that it could use [the] expert testimony to evaluate [the alleged victim's] 'believability.' " (*Id.* at p. 72.)

Similarly, the Fourth District Court of Appeal, Division One, in *Sexton*, *supra*, 37 Cal.App.5th 457, concluded that, when CALCRIM No. 850 is read in context, "[r]easonable jurors would not understand the instruction to mean that if they find the characteristics of intimate partner battering to be satisfied, this indicates that [the victim] was necessarily telling the truth." (*Sexton*, *supra*, 37 Cal.App.5th at p. 468.) The court in *Sexton* emphasized that the instruction "expressly indicates that the jury is to evaluate the believability of [the victim's] testimony, not mechanically transfer their evaluation of the expert to [the victim's] statements." (*Id.* at p. 467, italics omitted.)

Sloop has not presented any arguments that persuade us to reject the reasoning and conclusions of this court in *Brackins* or our sister Court of Appeal in *Sexton*. Sloop's reliance on *People v. Housley* (1992) 6 Cal.App.4th 947—a case involving expert testimony on child abuse accommodation syndrome—is unavailing. Citing *Housley*, Sloop argues that CALCRIM No. 850 "never makes the point" that " 'the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true.' " (*Housley*, at p. 957.) We do not agree with Sloop's interpretation of CALCRIM No. 850. The instruction here explicitly informed the jurors that the expert testimony "is not evidence that [Sloop] committed any of the crimes charged against him." Further, the instruction did not tell the jurors that they should find

892, 895–896 [concluding that expert testimony about the behavior of domestic violence victims is admissible under Evidence Code section 801, "because it would assist the trier of fact in evaluating the credibility of the victim's trial testimony and earlier statements to the police, by providing relevant information about the tendency of victims of domestic violence later to recant or minimize their description of that violence"].)

the victim credible based on the expert's testimony or suggest that the jurors should eschew their own evaluation of the victim's truthfulness in light of the expert's testimony. Rather, the instruction allowed the jurors to use the expert's testimony—if they credited it—as one factor in their evaluation of the victim's credibility. In addition, the jurors received other instructions that reinforced their charge to scrutinize the lay and expert witness testimony, including CALCRIM Nos. 226 (Witnesses), 301 (Single Witness Testimony), and 332 (Expert Witness Testimony).

Further, the instructions in Sloop's case are distinguishable from those in another case on which he relies, *People v. Sanchez* (2016) 63 Cal.4th 665. In *Sanchez*, the California Supreme Court addressed "the not-for-the-truth limitation" for case-specific hearsay evidence relied on by an expert. (*Id*. at p. 682.) Our Supreme Court observed, "When an expert is not testifying in the form of a proper hypothetical question and no other evidence of the case-specific facts presented has or will be admitted, there is no denying that such facts are being considered by the expert, and offered to the jury, as true." (*Id*. at p. 684.) Based on this premise, the Supreme Court concluded that the jurors could not logically follow "conflicting instructions" given to them regarding their evaluation of the expert's testimony. (*Id*. at p. 684.) The conflicting instructions in *Sanchez* informed the jurors of their duty to decide whether the information relied on by the expert was true, but also told them that certain case-specific evidence upon which the expert based his opinion was excluded from their consideration regarding its truth. (*Ibid*.)

In the present case, CALCRIM No. 850 did not present an analogous conflict regarding jurors' consideration of the evidence. Under the instruction, the jurors could logically evaluate the expert's general testimony (which did not directly opine on the victim's credibility) and the victim's conduct and believability, in light of the expert's testimony and the other evidence presented, while also deciding the question of Sloop's guilt based on the evidence but without considering the expert testimony as is directly

23

probative of Sloop's alleged criminal actions.  CALCRIM No. 850 does not suffer the flaws that existed in *Sanchez* because the instruction did not tell the jurors that they had to make a determination whether to credit certain information underlying a witness's testimony while at the same time telling the jurors they could not evaluate that information even though the witness relied on it to provide his or her testimony.

In sum, we conclude there is no reasonable likelihood that the jurors applied CALCRIM No. 850 in such a manner that the expert's testimony here was used as direct evidence of Sloop's guilt of the charged crimes or to reduce the prosecution's burden of proof.

Sloop's second argument concerning the uncharged crimes is equally unavailing. Although CALCRIM No. 850 only told the jurors that the expert testimony was not evidence that Sloop "committed any of the crimes charged against him," "there is no logical reason for any juror to believe the expert's testimony would be evidence the defendant committed the uncharged crimes but not the charged crimes."  (*Sexton*, *supra*, 37 Cal.App.5th at p. 468.)  Thus, we conclude there is no reasonable likelihood that the jurors understood CALCRIM No. 850 to permit them to use the expert's testimony as proof that Sloop committed the uncharged crimes and, in turn, the charged crimes.

For these reasons, we reject Sloop's claim of error regarding CALCRIM No. 850.

C.  *Senate Bill 136 and the Prior Prison Term Enhancement*

Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b), to limit prior prison term enhancements to only prior prison terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b).  (§ 667.5, subd. (b); Stats. 2019, ch. 590, § 1; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341.)

Sloop and the Attorney General agree that the prior prison term underlying the one-year prior prison term enhancement imposed at Sloop's sentencing was not served

for a sexually violent offense, (§ 667.5, subd. (b)) as do we.[15] The parties also agree, as do we, that the changes effected by Senate Bill 136 apply retroactively to cases in which the judgment is not yet final. (*People v. Winn* (2020) 44 Cal.App.5th 859, 872.) Thus, in accord with the Attorney General's recommendation, we reverse the trial court's true findings on all the prior prison term enhancements alleged in the information. (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 682 (*Jennings*).)

Further, the trial court here did not impose the maximum possible sentence on Sloop. Therefore, in accord with the parties' arguments, we conclude that remand is appropriate so the trial court can exercise its discretion to reassess Sloop's entire sentence since the one-year prior prison term enhancement is no longer authorized. (See *Jennings*, *supra*, 42 Cal.App.5th at p. 682; see also *People v. Navarro* (2007) 40 Cal.4th 668, 681; *People v. Buycks* (2018) 5 Cal.5th 857, 893.) In addition, we note the Attorney General's concession that the trial court on remand may impose any lawful sentence "so long as the aggregate sentence does not exceed 17 years 8 months." (See *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258–1259.)

D. *Discretionary Sentencing Decision on Counts 4 and 5*

Sloop contends this case must be remanded to the trial court so it can exercise the discretion it apparently did not realize it had under relevant sentencing statutes to impose concurrent sentences for counts 4 and 5. The Attorney General agrees with Sloop. We concur. (See *People v. Woodworth* (2016) 245 Cal.App.4th 1473, 1479 [§ 1170.15 "does not require the trial court to impose a consecutive sentence, but instead indicates that if the trial court chooses consecutive sentencing it must impose a full-term sentence for the witness dissuasion count."]; see also §§ 669, 1170, 1170.1.)

---

[15] We note that the record does not reveal specifically which of Sloop's prior prison terms was used as the basis for the one-year enhancement imposed at his sentencing. Nevertheless, none of Sloop's prior prison terms were for a sexually violent offense.

As stated above, we are remanding this case to the trial court for resentencing in light of the changed circumstances effected by Senate Bill 136. At Sloop's resentencing, the trial court should exercise its informed discretion whether to impose concurrent or consecutive sentences on counts 4 and 5. We do not express any opinion about how the trial court should exercise its discretion.[16]

## III.  DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for resentencing with directions to strike the one-year enhancement previously imposed under Penal Code section 667.5, subdivision (b), and exercise its discretion whether to impose concurrent or consecutive sentences on counts 4 and 5. Sloop's convictions are otherwise affirmed.

---

[16] As described above, the trial court did not orally pronounce sentences on the misdemeanor convictions (counts 7–11) at Sloop's original sentencing proceeding. (See fn. 6, *ante*.) At Sloop's resentencing, the trial court should impose sentences on each of the five misdemeanor convictions.

_____

Danner, J.

WE CONCUR:

_____

Greenwood, P.J.

_____

Grover, J.

**H047503**
*People v. Sloop*