Filed 3/12/21  P. v. Drop CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANDREW DROP,<br><br>    Defendant and Appellant. | H044970<br>(Santa Clara County<br>Super. Ct. No. C1241676) |

Appellant Robert Andrew Drop was convicted of continuous sexual abuse of a child under 14 (Pen. Code § 288.5, subd. (a)), aggravated sexual assault of a child under 14 and ten years younger than the defendant (Pen. Code, § 269), and two counts of sexual intercourse or sodomy with a child ten years of age or younger (Pen. Code, § 288.7, subd. (a)).  The trial court sentenced Drop to an indeterminate term of 65 years to life consecutive to a determinate term of 16 years in prison.

On appeal, Drop argues that the trial court prejudicially erred by:  (1) admitting expert testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS); (2) giving CALCRIM No. 1193 [Testimony on CSAAS]; (3) admitting evidence of an uncharged crime of possession of child pornography; and (4) giving a legally erroneous instruction on possession of child pornography.  Finally, he claims that even if these errors were not individually prejudicial, their cumulative impact warrants reversal.  We find that any challenge to the admission of statistical evidence of the frequency of false

reporting of sexual abuse was forfeited, and find no merit to Drop's other arguments. We affirm the judgment.

## I. BACKGROUND

### A. Prosecution's Case

Drop married Elena Doe in 2001 and became stepfather to Elena's daughter, J.D., and son, E.D. Drop adopted the children in 2005. When J.D. was in second grade and about six or seven years old, she walked into Drop's bedroom and found him masturbating to pornography. Drop asked her to help him masturbate and guided her hands to his penis. A couple of weeks later, he forced J.D. to perform oral sex on him. Drop continued to force J.D. to perform oral sex on him over the course of her second and third grade years. When J.D. was in third and fourth grade, Drop began to have sexual intercourse with her. J.D. estimated that it happened frequently during her fourth grade year, that there were four such instances during her fifth grade year, and that it happened less and less as she got older. By her sixth grade year, she recalled one such instance.

When J.D. reached seventh grade, she started to resist Drop's advances and no longer had sexual intercourse with him. During that period, however, Drop would frequently come into J.D.'s bed at night and place his hands on her body. Drop also frequently masturbated in J.D.'s presence.

In February 2011, Elena returned home after leaving for work because she forgot something at home and found Drop naked with an erection in J.D.'s bed. Drop claimed J.D. had a nightmare and he was consoling her. Although Elena knew this behavior was " 'bad' " she did not report it to the police because she did not want to " 'ruin [Drop's] life' " and because she feared he would deny any wrongdoing and punish the children.

In December 2011, J.D. was in bed in the same bedroom as Drop and Elena when she heard them beginning to have sexual intercourse. J.D. knocked on her headboard to let them know she was awake. In response, Drop said to J.D., "[C]ome on, why don't

2

you play with your fingers down there and let mommy have fun . . . ." This comment caused Elena to conduct online research regarding child sexual abuse. Her searches included "stepfather inappropriate touching [of] teen," "warning signs of sexual abuse in teenagers," and "behaviors to watch for when adults are with children . . . ."

Later that month, J.D. and Drop got into an argument, and J.D. texted Elena to ask her to come home. When Elena arrived, a fight commenced. Eventually, Drop pulled J.D. by the hair and Elena by the arm and threw them out of the house. Elena called the police. Later that day, Elena and J.D. met with a counselor to obtain a restraining order. During this meeting, J.D. disclosed the sexual abuse. J.D. appeared to be "very upset," "was crying," and "was scared."

About a year before J.D. disclosed the abuse, she told three of her close friends that Drop had been sexually abusing her. J.D.'s friends urged her to tell her mother about the abuse. J.D., however, "said she didn't want to break up the relationship between her mom and dad."[1]

## B. Defense Case

Drop denied that he sexually abused J.D. and asserted there was no evidence that he had engaged in sexual intercourse with her. He claimed she was prone to exaggeration and suggested she was untrustworthy. He agreed that some of the incidents described had occurred, but characterized them differently. Regarding the domestic violence incident, he asserted that Elena had attacked him and J.D. had intervened to protect him, and that J.D. had opened the door to allow Drop to push Elena out of the house. Drop believed there was a "conspiracy against [him] regarding this case," and argued at closing that J.D. and Elena created a story about the sexual abuse to facilitate the divorce and to ensure Elena received custody of the children.

---

[1] The prosecution also presented CSAAS evidence and evidence of the uncharged offense of possession of child pornography. This evidence will be discussed in more detail in the analysis of Drop's challenges on appeal.

## II. DISCUSSION

### A. Admission of CSAAS Evidence

Drop contends that the trial court abused its discretion by permitting Dr. Blake Carmichael to testify regarding CSAAS. He also argues that the trial court erred by allowing Dr. Carmichael to testify regarding the statistical frequency with which children fabricate claims of sexual abuse. We find that the challenge to the admission of Dr. Blake's testimony regarding CSAAS is without merit, and that any challenge to the admission of the statistical evidence was forfeited.

### 1. Background

Prior to trial, the prosecution noticed its intention to admit expert testimony on CSAAS. At an in limine hearing, defense counsel objected on the ground that CSAAS evidence would not be relevant. The prosecution argued it was relevant based on the "[l]ate discovery" of the abuse and J.D.'s "reluctance to disclose [based on] fear of [the] family dynamic being overturned and uprooted . . . ." The trial court ruled that "in light of the delay of disclosure and the family dynamic" it would allow Dr. Carmichael to testify about CSAAS.

Prior to Dr. Carmichael's testimony, the trial court revisited the issue of the CSAAS testimony. The prosecution noted that while it believed J.D.'s testimony had gone "fairly well" from the standpoint of explaining the late disclosure, defense counsel had nevertheless asked pointed questions about the nature of J.D.'s disclosure. The prosecution asserted that Dr. Carmichael's testimony could explain to the jury "why there's late disclosure. Why there's a feeling of helplessness. Why there's a fear of the family dynamic breaking up." Defense counsel argued that the testimony would not assist the jury. Defense counsel noted that during jury selection, "it appeared to me that they all seemed to understand that if someone is truly abused, that they may not tell right away." Defense counsel also noted that J.D. "was very clear and she explained herself. I believe [the jury] got it."

4

The trial court again agreed to allow the CSAAS expert testimony. As an initial matter, the court "did find that several of the areas that the witness intends to address were addressed by [J.D.]." However, the court determined that "without polling the jury to determine . . . whether or not they found [J.D.] credible on those areas, there's no way . . . to determine whether the additional witness would be helpful or necessary or not. And the Court is not going to preclude the [prosecution] from providing that additional information." The court concluded: "[G]iven that this is a case involving late disclosure and is a case involving other areas that are covered in [CSAAS], the Court will allow the witness to testify."

Dr. Carmichael testified that CSAAS seeks to explain how children might react or respond after they have been sexually abused. Dr. Carmichael cautioned that CSAAS is not a diagnostic tool, but rather "was intended to educate therapists, social workers[,] and dispel some of the myths that people hold with regard to this population of kids who we know have been sexually abused." Dr. Carmichael affirmed that he had not interviewed any witnesses and was not familiar with any of the details of the offenses alleged in this case.

Dr. Carmichael explained that there are five components to the CSAAS assessment, which may or may not be present in a given case: secrecy, helplessness, entrapment or accommodation, delayed and unconvincing disclosure, and recanting. With respect to delayed disclosure, he stated that sexually abused children commonly delay reporting abuse because of the "power differential" between the abuser and the child, and because the child often fears negative consequences like "splitting up [the family] because of something they said." Dr. Carmichael explained that more than half of sexual abuse victims do not report the sexual abuse until they are 18 years old. Dr. Carmichael also explained that when children finally do disclose the abuse, it is often difficult for them to give consistent or convincing accounts of what happened.

*2. Analysis*

"The governing rules are well settled.  First, the decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'  [Citations.]  Second, 'the admissibility of expert opinion is a question of degree.  The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard . . . .  [E]ven if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury.  It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness" '  [citation]."  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300 (*McAlpin*).)  A trial court's decision to admit or exclude CSAAS expert testimony is reviewed for abuse of discretion.  (*Id.* at p. 1299.)

" '[CSAAS] expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.)  There are, of course, limitations on the use of CSAAS evidence.  "First, the CSAAS evidence must be addressed to a specific 'myth' or 'misconception' suggested by the evidence.  [Citation.]  Second, 'if requested the jury must be admonished "that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true . . . .  The evidence is admissible solely for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." ' "  (*People v. Housley* (1992) 6 Cal.App.4th 947, 955.)

In this case, the trial court reasonably concluded that expert testimony about CSAAS evidence would be helpful to assist the jury by disabusing the jurors of commonly held misconceptions about child sexual abuse victims.  As *McAlpin* makes

clear, expert testimony is admissible if it will add to the jury's knowledge about a subject, unless that topic is a matter of common understanding for persons of average intelligence. While information about child sexual abuse is more readily available than in the past, it hardly qualifies as a matter of "common knowledge" for the average juror. As a result of Dr. Carmichael's experience in the field, he possessed more knowledge than jurors about the behavior of child sexual abuse victims, and the information he provided on CSAAS promoted a more thorough understanding of the seeming inconsistencies that can appear between the minor's testimony of abuse and her behavior at the time of the abuse.

J.D.'s testimony raised issues concerning two of the five categories of behaviors addressed by the CSAAS testimony: J.D.'s report of abuse occurred long after the abuse started and she continued to return to the home where Drop abused her. The CSAAS evidence was in this way linked to specific and common misconceptions regarding children who report sexual abuse. Dr. Carmichael's testimony thus gave the jury important contextual information about how child sexual abuse victims may react so that the jury could understand " 'the emotional antecedents of abused children's seemingly self-impeaching behavior' "—here, delayed reporting, and continued contact with the perpetrator of the acts. (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.)

Drop nonetheless contends that the CSAAS evidence was unnecessary, and therefore irrelevant, because during voir dire the jurors indicated that they understood that a child sexual abuse victim may not report the abuse immediately. Drop also notes that J.D. testified articulately about the delayed disclosure and thus the jury needed no help to understand it. Drop, however, identifies no authority for a requirement that the prosecution demonstrate that any individual juror hold or not hold preconceived notions about child sexual abuse to admit the CSAAS evidence. Common sense also indicates that neither the trial court nor trial counsel can predict the questions that might be posed in a juror's mind when actually hearing the testimony of a child witness, even a juror who might express an acquaintance with issues surrounding child abuse. Nor is there any rule

that CSAAS evidence is irrelevant if the abuse victim articulately explains the reasons for delayed disclosure. Rather, the relevant standard is whether the information will assist the jury in understanding an area outside of their common knowledge and whether the CSAAS evidence was directed at a myth or misconception raised by the evidence. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1299-1300.) Even if the jury " 'has some knowledge' " of delayed disclosure, such knowledge is not expertise, and the evidence is nevertheless admissible so long as the information would assist the jury. (*Id.* at p. 1300.) Because the CSAAS testimony here involved an area beyond the expertise of the average juror and addressed misconceptions that were logically raised by J.D.'s testimony, the trial court did not abuse its discretion by permitting Dr. Carmichael to testify.

## B. CSAAS Statistical Evidence

Drop argues that Dr. Carmichael's testimony about the false reporting of sexual abuse exceeded the scope of legitimate CSAAS testimony and that the trial court therefore admitted it in error. The Attorney General contends that the issue is forfeited because defense counsel failed to object to the challenged testimony. We agree with the Attorney General.

### 1. Background

During Dr. Carmichael's cross-examination, defense counsel questioned him about false allegations of child sexual abuse: "Doctor, if a teenager fabricates an allegation of molestation, they can say it happened right now or it's happening right now; right? They can say that; correct?" Dr. Carmichael responded: "People can lie about something that's happened to them. There's actually a lot of research that talks about false allegations made by children. The statistics are very low where a child initiated disclosures of sexual abuse. It's zero and 2 percent of allegations by children have been found to be false. So it can be that kids can lie about it." Defense counsel sought clarification: "But you just said, though, the child initiated it, allegations; correct?" Dr. Carmichael responded: "I did." Defense counsel continued: "Right. So aren't the

8

statistics higher for . . . they found false allegations to be higher where it's someone else other than the child that initiated the allegation, the disclosure, excuse me." Dr. Carmichael responded: "So the research that has higher rates of false allegations is with regards to custody disputes. And so in those cases they found . . . higher false allegation rates, like 38, 40 percent. Again, those are all made by the parents in the custody dispute. Even in more of a contemporary research where they looked at false allegations where there's no custody or child access issues in play, even then the false allegation rates were like from zero to four [percent] with the adults and closer to zero [percent] for the kids. So the false allegation rates outside of custody disputes is quite low." Defense counsel then moved on to a separate and unrelated line of questioning.

### 2. Analysis

Evidence Code section 353, subdivision (a)[2] provides that a verdict or finding will not be set aside by reason of an erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." The California Supreme court has " ' "consistently held that [a] 'defendant's failure to make a timely and specific objection' on the ground asserted on the appeal makes that ground not cognizable." ' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20.)

Drop argues that defense counsel's general objections to the CSAAS evidence were sufficient to preserve a challenge to the statistical evidence on appeal. We disagree. Drop objected to the admission of the CSAAS evidence in limine, arguing that it was unnecessary and irrelevant. The failure to raise a timely and *specific* objection forfeits a claim on appeal that evidence was erroneously admitted. (§ 353, subd. (a).) Defense counsel's general objection to the admission of the CSAAS testimony did not include an

---

[2] Subsequent statutory references are to the Evidence Code.

objection that the statistical evidence was unreliable or misleading, or that it exceeded the scope of what the trial court had allowed as admissible in its previous evidentiary ruling.

However, here it also appears there was no objection because defense counsel specifically elicited the challenged statements on cross-examination, voiced no contemporaneous objection, and did not subsequently move to strike the evidence. On the contrary, defense counsel delved further into the data, asking a follow-up question about "statistics . . . where it's someone else other than the child that initiated the allegation, the disclosure . . . ." Defense counsel's questions appear designed to raise doubts regarding J.D.'s credibility based on what counsel clearly hoped would be testimony from the prosecution expert that a certain percentage of children falsely report abuse, often encouraged by a parent in a family law custody dispute. The choice to pursue this line of questioning was not illogical as Drop testified that the genesis of the reported abuse was a conspiracy, and counsel later argued to the jury that Elena's desire for custody of the children in her divorce from Drop was the cause of J.D.'s report of abuse. The fact that the defense strategy did not work does not negate the fact that the lawyer deliberately probed the area now challenged on appeal, a decision to which we defer. (*People v. McDermott* (2002) 28 Cal.4th 946, 993 ["Such matters as whether objections should be made and the manner of cross-examination are within counsel's discretion and rarely implicate ineffective assistance of counsel. [Citation]"]; *People v. Stanley* (2006) 39 Cal.4th 913, 954 [" ' "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]' "].) Because Drop failed to specifically object to the challenged testimony, his challenge to its admission on appeal is forfeited.

10

### C. *Instruction on CSAAS Evidence*

Drop argues that the jury instruction applicable to CSAAS expert testimony was unduly confusing and "no jury would understand [that] the CSAAS evidence was inadmissible to prove the truth or falsity of the complaining witness's accusation." We do not agree.

#### 1. *Background*

The jury was instructed on the permissible use of CSAAS evidence with CALCRIM No. 1193 as follows: "You've heard testimony from Dr. Blake Carmichael regarding [CSAAS]. The doctor's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. You may consider the evidence only in deciding whether or not [J.D.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." In arguing that CALCRIM No. 1193 is erroneous, Drop highlights the last portion of the instruction, which states that the jury may consider the evidence "in evaluating the believability of [J.D.'s] testimony."

#### 2. *Analysis*

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In so doing, we consider the instructions as a whole to determine whether there is a " 'reasonable likelihood that the jury construed or applied the challenged instruction in an objectionable fashion.' " (*People v. Osband* (1996) 13 Cal.4th 622, 679.) We assume the jurors are "capable of understanding and correlating all jury instructions which are given." (*People v. Romo* (1975) 47 Cal.App.3d 976, 990, disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213-214.)

In *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*), the defendant argued that "the misleading language of CALCRIM No. 1193 allowed the CSAAS testimony to be used as proof that [the victim] was molested," and that it was "impossible to use CSAAS testimony to evaluate the believability of [the victim's] testimony without

11

using it as proof that [defendant] committed the charged crimes." (*Id.* at p. 503.) The Court of Appeal rejected these arguments, noting that the instruction was given in the context of the expert's testimony that CSAAS is a tool to understand a child's reactions when she claims she has been abused and is not to be used to determine whether the abuse has occurred. (*Id.* at pp. 503-504.) The court held that a "reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS] testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior." (*Id.* at p. 504.)

As in *Gonzales*, we conclude that no reasonable juror could have concluded from the language of CALCRIM No. 1193 that he or she could properly use the CSAAS evidence as a basis for determining whether the charged offenses occurred. Here, Dr. Carmichael testified that CSAAS is only an educational tool used to dispel common myths about sexual abuse, and it is not a diagnostic tool to prove that sexual abuse occurred. Further, CALCRIM No. 1193 told the jury that the CSAAS evidence "is *not* evidence that the defendant committed any of the crimes charged against him." (Italics added.) It also told the jury that the they could "consider this evidence only in deciding whether or not the conduct of [J.D.] was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." We must presume the jury followed the court's instructions. (*People v. Wilson* (2008) 44 Cal.4th 758, 834.)

While it is true that evaluating an alleged sexual abuse victim's "believability" may ultimately assist the jury in determining whether to credit the victim's testimony that the abuse occurred, the same may be said of any evidence that is admitted solely on the issue of a witness's credibility. (See *People v. Brackins* (2019) 37 Cal.App.5th 56, 70-72 [expert testimony about intimate partner violence "could properly be used by the jury to

12

evaluate" the believability of victim's abuse claims].)  As CSAAS evidence may properly be used to determine whether a child-victim's conduct was inconsistent with that of a person who has been abused, it is properly used to evaluate a child-victim's credibility. Read as a whole, the instruction properly advised the jury on the limited purpose to which it could put CSAAS evidence.  Thus, the trial court did not err in giving CALCRIM No. 1193.

Drop also suggests that the trial court erred by not giving an immediate "preinstruction or caution" before or after Dr. Carmichael's CSAAS testimony. Although he cites cases where the trial court gave a pre-testimony limiting instruction and a post-testimony admonishment—*People v. Brown* (2004) 33 Cal.4th 892 (*Brown*) and *People v. Patino* (1994) 26 Cal.App.4th 1737 (*Patino*)—neither *Brown* nor *Patino* held that such actions were necessary or required.  Drop directs us to no authority that *requires* a trial court to give additional instructions or admonishments immediately before or after CSAAS testimony, although this is the better practice.  We find no error in the trial court's decision not to give such a preinstruction or caution.

## D.  Admission of Child Pornography Images

Drop argues that the trial court erred by admitting evidence of the uncharged crime of child pornography.  We conclude that the court properly exercised its discretion.

### 1.  Background

San Jose Police Detective Michelle Hinch testified as an expert in computer forensic examination.  During the course of the investigation, Detective Hinch performed a forensic analysis of the hard drives of a computer recovered from Drop's home.  She found that the computer had separate user accounts for Drop, J.D., A.D., and an administrator.  The separate user accounts were protected by passwords.  Drop testified that the account names and passwords were written down and easily accessible to anyone who used the computer.  Under Drop's user account, Detective Hinch found two images

13

of child pornography in a temporary internet files folder.[3]  Detective Hinch testified that temporary internet files are created automatically by the computer's operating system after viewing a web page in order to load web pages quicker the next time a user tries to access them; it is not intentionally created by the user.  Detective Hinch noted there was no way to tell how long the user viewed the child pornography images.  She also acknowledged it was "possible" that the image was the "size of . . . a thumb nail pop-up" in a "very small square in a corner of a computer screen."

Drop moved in limine to exclude the two child pornography images.  He argued that the images were not relevant and that there was "no proof" that he accessed the images or "had possession over any of [the] images found" on the computer.  Drop also argued that the images were more prejudicial than probative because the label of child pornography would lead jurors to "convict [him] in their head[s] before listening to any testimony."  Because the images depicted child pornography, and the charges before the jury involved child sexual abuse, the prosecution sought to present the images as permissible propensity evidence under section 1108.

After hearing argument, the trial court determined that the images were admissible under section 1108.  The court found there was sufficient foundation for the jury to find by a preponderance of the evidence that the images constituted child pornography and were in Drop's possession.  The court noted that the images were attributed to a folder belonging to Drop and were not stored in unallocated space on the hard drive.  The court also noted that while there were other people who had access to the computer, "they had their own folders and they used their own folders when they were using the computer."

---

[3] Detective Hinch explained that "it was on the hard drive in Documents and Settings under the user Robert/local settings/temporary internet files/content.i.e.5, and then there's a long number, folder, that the operating system creates that it was inside that."  The characterization of the images as child pornography was not disputed by Drop at trial and is not challenged on appeal.

## 2. *Analysis*

"Section 1108 is an exception to the general prohibition against admitting character evidence to prove criminal disposition or propensity.  [Citations.]  In a sexual offense prosecution, the statute permits the admission of evidence that the defendant 'committed other sexual offenses to prove his propensity to commit the charged sexual offense[],' so long as the evidence is admissible under section 352.  [Citations.]  (*People v. Jandres* (2014) 226 Cal.App.4th 340, 352-353, fn. omitted.  (*Jandres*).)

"[T]he admissibility of uncharged conduct pursuant to section 1108 turns on the existence of a preliminary fact—namely, that the uncharged conduct constitutes a statutorily-enumerated 'sexual offense.'  [Citation.]  The trial court must make a preliminary determination of whether the proffered evidence is sufficient for the jury to find, by a preponderance of the evidence, that the defendant committed an enumerated offense.  [Citations.]  'The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion."  [Citation.]  Accordingly, we review the trial court's determination of this preliminary fact under the abuse of discretion standard."  (*Jandres*, *supra*, 226 Cal.App.4th at p. 353.)

"If we find no abuse of discretion, we consider whether the evidence nevertheless should have been excluded under section 352 because its prejudicial effect outweighs its probative value.  We also review the trial court's decision in that regard for abuse of discretion.  [Citation.]"  (*Jandres*, *supra*, 226 Cal.App.4th at pp. 353-354.)  Under section 352, "[t]he evaluation of the potential for prejudice must consider numerous factors, including '[the prior sex offense's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or

15

excluding irrelevant though inflammatory details surrounding the offense.' [Citation.] Other relevant factors include whether the uncharged acts are more inflammatory than the charged conduct, the possibility the jury might confuse the uncharged acts with the charged acts and seek to punish the defendant for the uncharged acts, and the time required to present the evidence of the uncharged acts." (*People v. Daniels* (2009) 176 Cal.App.4th 304, 316-317.)

Penal Code section 311.11, subdivision (a), describes possession of child pornography as "knowingly possess[ing] or control[ling]" a "representation of information, data, or image" that involved a person under 18 years old on, among other things, any "computer hardware" or "data storage media . . . ." In this case, both of the images that the prosecution introduced as evidence at trial were discovered under Drop's user account, which was password-protected. In addition, the files were found in a folder that was created automatically by the computer's operating system when the user visited a particular website where the image was displayed. Although Drop argued that other people had access to the computer and could have generated the child pornography images, the trial court found that the computer's users had and appeared to use their own accounts. Thus, the trial court properly found that there was sufficient evidence for a jury to conclude, by a preponderance of the evidence, that Drop possessed child pornography.

In arguing that there was insufficient evidence to establish his possession or control of the images, Drop cites to a number of federal cases. He contends there was no evidence of *knowing* possession of child pornography image files, especially in light of the fact that they were in a temporary internet folder. This argument and its reliance on federal cases, however, is unavailing here. Crucially, the language of Penal Code section 311.11, subdivision (a), is "material[ly] differen[t] from the federal pornography statute" found at title 18 of the United States Code, section 2253(a)(5)(B). (*Tecklenburg v. Appellate Division* (2009) 169 Cal.App.4th 1402, 1418 (*Tecklenburg*).) In particular, "the federal statute does not make it illegal to knowingly possess or control an image of

16

child pornography; only to knowingly possess the material containing the image. In the context of computer child pornography, it is understandable that the federal courts have focused, therefore, on the data stored in the computer's files as that which is illegal under the federal statute to possess. Without knowledge of such files, there can be no 'knowing' possessing under the federal statute." (*Id.* at pp. 1418-1419.) "[T]he language of [Penal Code] section 311.11, subdivision (a) is not so limited," as it "makes it directly illegal to knowingly 'possess[] or control' any 'image' of child pornography." (*Id.* at p. 1419.) Thus, under California law, a defendant may violate Penal Code section 311.11, subdivision (a) even if there is no evidence that "defendant was aware of the [temporary internet files] or cache" where the images were stored. (*Tecklenburg*, at p. 1419.) Thus, the trial court did not abuse its discretion in finding that there was sufficient foundation to admit the evidence of the uncharged offense of child pornography.

We now turn to whether the evidence should have been excluded as more prejudicial than probative under section 352. Under the standard articulated above, we conclude that the trial court did not abuse its discretion when it found the evidence admissible under section 352. First, the evidence that Drop possessed child pornography was relevant and highly probative of his attraction to young girls. Evidence of child pornography " 'presented in the content of [a] defendant's possession of them[] yield[s] evidence from which the jury could infer that he had a sexual attraction to young [girls] and intended to act on that attraction.' " (*People v. Avila* (2014) 59 Cal.4th 496, 519.) Second, the uncharged conduct of possessing two child pornography images was significantly less inflammatory than the charged acts, which involved numerous acts of sexual abuse and sexual assault of a child, including aggravated sexual assault, with the earliest acts occurring when J.D. was just six or seven years old. Given the nature of the charges, it is improbable that the jury was confused by the uncharged acts, or were led to punish Drop by convicting him of the charged sexual assault on J.D. because he possessed images of child pornography.

17

Finally, the admission of the uncharged crime evidence did not consume an undue amount of time. Section 352 requires that evidence be excluded only if its probative value is "substantially" outweighed by the undue consumption of time. Here, the trial spanned five days of testimony and over 900 pages of court reporter's transcript. The testimony on the child pornography images occurred on a portion of a single day and comprised only 26 pages of transcript. Because the evidence was highly probative of Drop's attraction to young girls and the consumption of time was not undue, the salacious nature of the images and the stigma attached to the possession of such images did not substantially outweigh the probative value of the evidence. Accordingly, the trial court did not abuse its discretion in admitting the evidence of the uncharged offense of possession of child pornography.

### E. Instruction on Possession of Child Pornography

Drop contends that the jury instruction given regarding the uncharged offense of possession of child pornography misstated the law. He argues it was incorrect to tell the jury "that child pornography charges apply to one who 'knowingly possesses or controls' the image at issue." We do not agree.

### 1. Background

The trial court gave the following instruction: "The People presented evidence that the defendant committed the crime of possession of child pornography that was not charged in this case. This crime is defined for you in these instructions. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense."

In relevant part, the trial court instructed on Penal Code section 311.11, subdivision (a), as follows: "Every person who knowingly possesses or controls matter or representation of the information, image, data, or movie, the production of which involved the use of a person under the age of 18 years, knowing that the matter depicts a person under the age of 18 years personally engaging in or simulating sexual conduct,

18

masturbation, or exhibition of the genitals or pubic or rectal area or sodomy. [¶] In order to prove the crime, each of the following elements must be proved. Every person who: [¶] (1) Knowingly possesses or controls; [¶] (2) Any matter, the production of which involves the use of a person under age 18; and [¶] (3) Knowledge that the matter depicts a person under 18 engaging in sexual conduct."[4]

### 2. Analysis

Drop challenges the trial court's use of the phrase "knowingly possesses or controls" in the instruction. He points to the definition of possession in other CALCRIM instructions, specifically possession of drugs and possession of a controlled substance, as more accurate. The challenged language, however, is drawn directly from Penal Code section 311.11, subdivision (a). "By its plain language [Penal Code] section 311.11, subdivision (a), prohibits *either* possession *or* control of any child pornography." (*Tecklenburg*, *supra*, 169 Cal.App.4th at p. 1418.) In that respect, the special instruction accurately stated the elements of the offense of possession of child pornography, as reflected in the relevant statute. Drop's reliance on the definitions of possession in unrelated CALCRIM instructions is therefore irrelevant.

### F. Cumulative Error

Drop argues that even if the errors he asserts were not individually reversible, their cumulative effects prejudiced his right to a fair trial and warrant reversal. Because we find no errors, however, there is no cumulative prejudice.

### III. DISPOSITION

The judgment is affirmed.

---

[4] The instruction was proposed by the prosecution "in light of the fact [Penal Code section] 311.11 [subdivision (a)] does not have a [CALCRIM] jury instruction."

_____
Greenwood, P.J.

WE CONCUR:


_____
 Bamattre-Manoukian, J.




_____
 Grover, J.




People v. Drop
No. H044970